In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2645

DIONTRA COMMON and MICHAEL SMITH, SR.,
Co-Administrators of the Estate of
Michael Smith, deceased,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, a municipal corporation, and
OFFICER GUY NELSON,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 cv 6592—**Matthew F. Kennelly,** *Judge*.

ARGUED MARCH 30, 2010—DECIDED OCTOBER 20, 2011

Before POSNER, ROVNER, and TINDER, *Circuit Judges*.

ROVNER, *Circuit Judge*. On November 18, 2006, Chicago
Police Officer Guy Nelson fatally shot Michael Smith as
he exited a convenience store on Chicago's south side.
After his family sued the officer and the City, a jury
found that the officer had not used excessive force

against Smith. The only question in this appeal is whether the district court judge erred by allowing in evidence that Smith had drugs secreted in his mouth at the time of the shooting.

## I.

Due to the limited evidentiary question presented in this court, we cite only those facts essential to that question on appeal. On November 18, 2006, Officer Nelson and his partner, Officer Sean O'Brien, visited a convenience store on the south side of Chicago.[1] The owner of the store told the officers that a robbery suspect frequented his store and that although he had called the police in the past, by the time the police arrived, the suspect was always gone. Officer Nelson gave the store owner his cellular telephone number and told the owner to call should the robbery suspect enter the store again. Later that afternoon, the owner called Officer Nelson to tell him that the robbery suspect of whom they had spoken was in the store again, along with two other men, all three African-American, in their late teens or early twenties, and wearing dark clothing. The officers set off for the store and Officer Nelson took his secondary firearm from his ankle holster and placed it into his right coat pocket. Upon

---

[1] Although the plaintiffs initially named Officer O'Brien as a defendant, at the close of evidence, the plaintiffs moved to voluntarily dismiss the counts against O' Brien as well as all of the state law counts. R. 158.

arriving at the store, the officers saw, exiting the store, the three men who met the store owner's description. At this point, the accounts by the various witnesses differ, but this court's obligation is to view the evidence in the light that supports the jury's verdict. *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 567 (7th Cir. 2011). Officers Nelson and O'Brien both testified that Officer Nelson identified himself as a police officer and told the men to stop and show their hands. Two of the three men complied, but Smith turned and headed away from the officers with his hands in a position not visible to Officer Nelson. Officer Nelson ordered Smith to show his hands at least three times, but Smith failed to comply. Because he could not see what Smith was doing with his hands, Officer Nelson removed his revolver from his pocket. Just as he was removing it, he felt Smith's hand grab for his wrist and pull forward. Officer Nelson, fearing that he was losing control of the gun and that his life was in danger, fired one shot at Smith. That gunshot pierced Smith's chest, he fell forward, and died shortly thereafter.

During an autopsy, the medical examiner discovered five small plastic bags containing cocaine—four in Smith's right chest cavity and one in his trachea. The medical examiner surmised that the four packets had been in Smith's upper airway but fell into his chest cavity during the autopsy and that the other packet also had been in the upper airway but was aspirated into Smith's trachea at the time of the shooting.

Prior to trial, pursuant to a motion in limine, the district court concluded that the evidence regarding

the packets of drugs found in Smith's body was admissible and could be introduced, a decision we review for abuse of discretion only, as district courts possess particular competence on matters of evidence. *Breneisen v. Motorola, Inc.*, No. 10-1982, 2011 WL 3873771, *2 (7th Cir. Sept. 2, 2011).

## II.

A fact finder assessing whether a police officer has used excessive force must analyze the claim under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard requires that a fact finder analyze whether the officer's actions are objectively reasonable in light of the facts and under the circumstances confronting the officer at the time of the incident, without regard to the underlying motive or intent of the officer, and without the benefit of hindsight. *Id.* at 396-97. This circuit clarified in *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (*en banc*), that the "circumstances" to which the *Graham* court referred must mean "only those circumstances known and information available to the officer at the time of his action (firing the fatal shot)." *Id.* at 804. Knowledge and facts gained after the fact, the *Sherrod* court concluded, have no proper place in a court's or jury's analysis of the reasonableness of the actor's judgment. *Id.* at 805. A jury must stand in the shoes of the officer and judge the reasonableness of his actions based on the information he possessed in responding to that situation. *Id.* at 804-05. In short, when evaluating the reason-

ableness of an officer's actions, the fact finder must do so with blinders on—viewing the circumstances and facts only as they were known to the officer at the time. We reinforced this holding in *Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997), noting that "evidence outside of the time frame of the shooting is irrelevant and prejudicial." *Id.* at 1339. Taken at face value, these holdings would seem to indicate that the evidence of drugs in Smith's body should not have been admitted at trial. After all, Officer Nelson did not and could not have known that Smith was hiding drugs in his mouth at the time he opened fire.

The *Sherrod* and *Palmquist* decisions, however, do allow a peek under the blinders in certain circumstances. The *Sherrod* court was first to recognize that its holding could "not be interpreted as establishing a black-letter rule precluding the admission of evidence" outside the officer's knowledge. *Sherrod*, 856 F.2d at 806. That opinion recognized two specific instances wherein a court could look at evidence outside the knowledge of the police officer in an unreasonable force case. First, the court noted, the credibility of the witness "can always be attacked by showing that his capacity to observe, remember or narrate is impaired." *Id.* Second, a witness could always be impeached by demonstrating contradictions in his testimony. *Id.* As an illustration, the *Sherrod* court went on to say, "[f]or example, if an officer testifies that 'I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand,' then proof that the suspect had neither gun nor knife would be material and admissible to the officer's credibility on

the question of whether the officer saw any such thing." *Id.* On the other hand, the *Sherrod* court noted, "if the officer says 'I saw the suspect reach quickly for his pocket,' then proof of the contents of the pocket does not contradict the officer's testimony." *Id.*

In *Sherrod*, a police officer had approached a suspected robber's automobile. The officer ordered the driver, Sherrod, and his passenger to raise their hands three times before they complied. As the officer approached the vehicle, he observed the driver make a quick movement with his hand into his coat. Fearing that Sherrod was reaching for a gun, the police officer fired his weapon, killing him instantly. A later search revealed that Sherrod was unarmed. *Id.* at 803-04. The trial judge allowed the plaintiffs to present the evidence that Sherrod was unarmed, reasoning that "the jury would have been left to speculate as to whether [the officer] was justified in thinking that the claimed movement by Sherrod posed a danger to the police officer." *Id.* at 804. This court reversed on the basis that "[k]nowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise, . . . the jury would possess more information than the officer possessed when he made the crucial decision." *Id.* at 805. The officer in *Sherrod* did not testify that he saw an object in the deceased hands, but rather that he saw the suspect make a quick movement with his hand into his coat. The testimony that Sherrod reached into his

coat was thus uncontroverted.[2] Thus the evidence that Sherrod was unarmed was irrelevant for impeachment purposes, and the jury had to determine the reason-ableness of the officer's action using only those facts known to the officer at the time. *Id.* at 806-07.

Similarly, in *Palmquist*, police officers responded to a call that a man was screaming profanities, making death threats, howling at the moon, and breaking windows. When they arrived at the scene, they found a belligerent Palmquist, standing outside of his house screaming obscenities and incoherent statements and brandishing a muffler pipe. *Palmquist*, 111 F.3d at 1335. When the officers attempted to arrest Palmquist for breaking win-dows, he swung the pipe and hit an officer. After he swung a second time, another officer fired and maimed Palmquist. Palmquist stood back up and said, "You only winged me—you'll have to kill me," as he lifted the pipe and swung it in the direction of an officer. *Id.* at 1336. That officer fired repeatedly into Palmquist's arm and then, before long, at his core, eventually killing him. What the officers at the scene did not know was that Palmquist was depressed, suicidal, and had told his friends on numerous occasions that he wished to commit "suicide by police." *Id.* at 1337. They also did not

---

[2] There may have been conflicting evidence about *how* Sherrod reached into his jacket, but no witness testified that Sherrod did not reach into his pocket at all, or that, as witnesses testified in this case, the deceased remained immobile with his hands in the air. *See Sherrod*, 856 F.2d at 810 (Cummings, J. dissenting).

know that just a few hours before the neighbors' 911 call, Palmquist had been arrested for drunk driving and possession of marijuana. Relying on *Sherrod*, the *Palmquist* court upheld the lower court's decision that information regarding the deceased's suicide wish was not admissible as it was not known to the officers at the time of the action. *Id.* at 1341. The exclusion of evidence about the intoxication, arrest, and marijuana possession posed a closer question for the court. Evidence of a plaintiff's intoxication, the *Palmquist* court surmised, could be admissible under Fed. R. Evid. 403 because it "tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life." *Id.* at 1342. In this way, the *Palmquist* court further elaborated on the exceptions to the "only what the officer knew" rule. Ultimately, the *Palmquist* court concluded that although the evidence could have been admitted, it was in any event cumulative, or at least its exclusion constituted harmless error. *Id.* And given our deference to a district court's determinations on matters of evidence, the omission of the evidence did not support grounds for reversal. *Id.*

The *Palmquist* intoxication exception is not at issue here—it is uncontroverted that the packets of drugs in Smith's body remained intact and that he had no traces of drugs in his system at the time of death. Thus no one can, nor does, argue that Smith acted the way he did because of drug intoxication. On the other hand, the packets of drugs in Smith's mouth made it more likely

that Smith acted in the way that Officer Nelson contended he acted as opposed to the way that other witnesses contended he did. The fact that Smith possessed illegal drugs gave him a motive to avoid their discovery—by hiding them in his mouth, for example. This made it more likely that he would initially turn from the officer and hide his hands as he took the drugs from his pockets and placed them in his mouth. It also made it more likely that Smith might engage in a flight or fight response—either turning away from the police, as he seemed to have done initially, or turning toward the officer and grabbing for his gun. In this case, unlike in *Sherrod* or *Palmquist*, the evidence of the deceased's behavior was highly contested. Under Officer Nelson's version of events, Smith turned away from him, refused to show his hands, and then Smith eventually turned back toward Officer Nelson and grabbed his gun. Under the estate's version of the events, Smith immediately complied with Nelson's command to raise his hands, turned and faced Officer Nelson with his hands raised, but nevertheless Officer Nelson shot him at point-blank range.

Although this court must view the facts in the light most favorable to the jury's verdict, we note some additional testimony that contradicted Nelson's version of events for the purpose of demonstrating the contested nature of the testimony. For example, the owner of a hair salon two storefronts away from the convenience store testified that he saw Smith with his hands in the air, and another man approaching him head on, pointing a gun. R. 186, p. 387. That witness testified that when

the gun was at arm's distance away, the shooter (now known to be Officer Nelson) fired, and that there was no struggle and Smith did not grab for Officer Nelson's gun. R. 186, pp. 388, 393. It is worth noting that the hair salon owner testified both that Smith was twisted away from the shooter at the time of the shooting, (R. 186, p. 395), and that he was "squared off shoulder to shoulder." R. 186, pp. 413, 415.

An employee of the convenience store and friend of Smith's family testified both that he saw three sets of hands up in the air (presumably those of both Smith and his two friends) (R. 186, pp. 324, 340), but also that he did not specifically see Smith's hands in the air, but rather only the hands of the last man to exit the store. R. 186, pp. 346-47. A third witness who was entering a car in front of the convenience store did not see the shooting but testified that he never heard anyone say "stop, police" or anything similar, and that he never heard signs of a struggle or running. R. 185, p. 71.

As the *Sherrod* court noted, and we too conclude today, where the facts are controverted in a reasonable force case, impeachment by contradiction is allowed. *Sherrod*, 856 F.2d at 806. Just as evidence of a gun would make it more likely that an officer saw a shiny metallic object in a suspect's hand, evidence of the drugs secreted in Smith's airway made it more likely that Smith acted as Officer Nelson testified, as opposed to the manner in which plaintiffs' witnesses testified. Smith's behavior was, after all, not ordinary behavior for a person encountering the police.

Smith's estate asserts that the risk of prejudice from the drug evidence outweighed any probative value and that the district court, therefore, erred in admitting the evidence. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. We ordinarily review a district court's evidentiary rulings under an abuse of discretion standard and give "special deference" to the district court's findings pursuant to Rule 403, reversing only when "no reasonable person could take the view adopted by the trial court." *United States v. Moore*, 641 F.3d 812, 826 (7th Cir. 2011).

The district court in this case carefully considered the potential prejudice and discussed it with the parties on three separate occasions, inviting the parties to proffer limiting instructions. R. 166, p. 14; R. 187, pp. 673-77, 709-22. The district court considered the proffered instructions, and then suggested that if the plaintiff thought the limiting instruction might backfire by calling more attention to the drug evidence, the estate's attorneys could simply argue the limitation in closing. After considering it, plaintiffs' counsel ultimately decided to do just that—forego the limiting instruction.[3] R. 187, p. 676,

---

[3] The plaintiffs originally offered a limiting instruction that would have said that the drugs could "not be considered by you regarding whether the officer used excessive force or whether his conduct was willful and wanton." R. 187, p. 674. The defendants' proposed instruction said that the drug

(continued...)

711. This was a considered legal strategy. A party who declines the opportunity to have a limiting instruction, waives the right to claim that he has been prejudiced by evidence that is otherwise relevant and admissible. *United States v. Wheeler*, 540 F.3d 683, 693 (7th Cir. 2008) (defendants' declination of limiting instruction waived their claim of prejudice); *See also Goetz v. Cappelen*, 946 F.2d 511, 514 (7th Cir. 1991) (same).

Even if Smith's estate has not waived the right to claim prejudice, it faces the tough hurdle overcoming our deference to this particular type of evidentiary ruling. After all, all evidence is prejudicial. Evidence is "unfairly prejudicial in the context of Rule 403 if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Albiola*, 624 F.3d 431, 440 (7th Cir. 2010) (internal citations omitted). Although a district court must be cautious and consider prejudice when admitting such evidence, certainly there are permissible uses of drug evidence in non-drug crime cases. *See United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987) (noting that there are times when drug use may be ad-

---

[3] (...continued)

evidence "is to be considered by you for the purpose of determining whether Michael Smith attempted to disarm Officer Nelson only and for no other purpose." *Id.* The district court held that the evidence would be admitted "on the theory that it . . . of events," and thus the plaintiffs' version of the instruction would not be appropriate. R. 187, p. 675.

mitted over a Rule 403 objection). Courts have admitted evidence of drug possession over Rule 403 objections when the drug possession tends to corroborate an element of a separate criminal offense. *See, e.g., United States v. Sanchez*, 615 F.3d 836, 841-42 (7th Cir. 2010) (allowing in evidence of drug trafficking to demonstrate motive in a kidnapping case); *United States v. Strong*, 485 F.3d 985, 990 (7th Cir. 2007) (allowing in evidence of drug possession over a Rule 403 objection in a felon-in-possession of a firearm case because the drug evidence supplied a motive for having the gun). In this case, the drug evidence was not admitted for the purpose of making a general character attack, but rather because it tended to make it more probable that the plaintiff acted as the defendant contended he did. *See Palmquist*, 111 F.3d at 1342. The evidence was used to rebut the plaintiffs' argument that Smith exited the store and immediately complied with the officer's direction to put his hands in the air. It was also used to demonstrate that Smith had a motive to turn away from the officer to conceal the drugs and then attempt to gain control of Officer Nelson's weapon. The evidence was limited to two photographs showing the drug packets recovered from Smith's body and the dry and succinct medical testimony of the medical examiner, occupying merely five pages of trial transcript, about where the packets were found in Smith's body and how they most likely arrived there. R. 187, pp. 576-77, 582-83. No one discussed drug sales, drug use, gang membership, or any type of criminal activity.

The district court did not err in admitting the drug evidence. And because we decide that the court did not

err in admitting the evidence, no new trial is warranted. The judgment of the district court is AFFIRMED.