Joseph **DOORNBOS**, Plaintiff-Appellant,

v.

**CITY OF CHICAGO, et al.,**
**Defendants-Appellees.**

No. 16-1770

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 2017

Decided August 18, 2017

Rehearing and Rehearing En Banc
Denied November 1, 2017*

* Circuit Judge Posner retired on September 2, 2017, and did not participate in the consideration of this petition for rehearing and rehearing en banc.

Torreya L. Hamilton, Attorney, Hamilton Law Office, LLC, Thomas P. Needham, Attorney, Law Office of Thomas P. Needham, Chicago, IL, for Plaintiff–Appellant.

Justin A. Houppert, Attorney, City of Chicago Law Department, Chicago, IL, for Defendants–Appellees.

Before BAUER, POSNER, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

Plaintiff Joseph Doornbos was leaving a Chicago train station when a plainclothes police officer confronted him, grabbed him, and with the help of two other plainclothes officers, forced him to the ground. Doornbos was acquitted in a criminal trial for resisting arrest. He then filed this suit against the three officers and the City of Chicago for excessive use of force and malicious prosecution. Doornbos contends that Officer Williamson failed to identify himself as an officer and then used excessive force to tackle and subdue him. Officer Williamson claims that he properly identified himself as a police officer and that Doornbos fled when Williamson attempted to stop and frisk him. The case went to trial, and the jury returned a verdict in favor of the officer-defendants. On appeal, Doornbos argues that the district court erred in two ways: by admitting evidence that he had marijuana in his pocket at the time of the incident, and by improperly instructing the jury about investigatory *Terry* stops.

We find that the district court did not abuse its discretion by admitting the marijuana evidence. Although the marijuana was unknown to the officers at the time they used force against Doornbos, it was evidence that arguably tended to corroborate their account of Doornbos's behavior.

The jury instructions on *Terry* stops, however, were inadequate. Over Doornbos's objection, the court instructed the jury only on investigatory stops but not frisks. Yet Officer Williamson's own testimony indicates that he was starting a frisk when he first approached Doornbos. His own testimony also makes clear that he did not have reasonable suspicion that Doornbos was armed and dangerous. Doornbos was entitled to have the jury know that the attempted frisk, which even the defense says produced the use of force, was unjustified. The court erred further during deliberations. The jury asked the judge whether plainclothes officers are required to identify themselves when they conduct a stop. The judge said no. We conclude that the answer is yes. In all but the most unusual circumstances, where identification would itself make the situation more dangerous, plainclothes officers must identify themselves when they initiate a stop. Because these errors were not harmless, we vacate the judgment for defendants and remand for a new trial.

I. *Factual and Procedural Background*

A. *Confrontation at the Wilson Avenue Station*

On February 15, 2013, Doornbos took a local Chicago train to visit a friend's home.

At approximately 7:30 p.m., he got off the train at the Wilson Avenue stop in the Uptown neighborhood of Chicago. As Doornbos left the station he was approached by Officer Williamson. The officer was dressed in jeans, a black hooded sweatshirt, a jacket, and a baseball cap. Here the accounts diverge.

According to Officer Williamson's trial testimony, he saw Doornbos holding a large can of beer that was partially covered by a brown bag. He did not see Doornbos drink the beer, nor could he tell if the can of beer was even open. Nonetheless, he decided to investigate further. (A Chicago Transit Authority ordinance prohibits possessing an open container of alcohol while using the transportation system. See Chicago Transit Auth. Ordinance No. 016-110, Sec. 1(4) (2016), available at http://www.transitchicago.com/assets/1/ordinances/016-_110.pdf.) Williamson testified that as Doornbos left through the turnstiles, he approached Doornbos, said "Chicago police officer," and lifted his shirt to display his belt, on which were clipped a badge, gun, and handcuff case.

As Officer Williamson drew near to Doornbos, he reached out with one hand to grab Doornbos's arm. Williamson testified that he reached out to frisk Doornbos for weapons. When asked in the trial why he thought Doornbos might be armed, Williamson said that it was a high-crime area, it was dark, Doornbos may have been breaking the law by drinking beer, and Doornbos was wearing a jacket with "deep pockets" in which he "could have hidden anything."

Officer Williamson testified that as he reached out to grab Doornbos, Doornbos pushed him away, dropped the beer, and tried to run. He grabbed Doornbos's jacket, and Doornbos dragged him approximately twenty feet. Williamson testified that Doornbos was screaming loudly for

help and yelling that he was being robbed, but that Williamson was saying "stop, police." After Doornbos started to stumble, Williamson testified that they "basically fell to the ground together," or as he described it later, he "forcibly guide[d] him to the ground." Doornbos was still screaming for help, and two other officers came to help Officer Williamson, not Doornbos. The officers found in Doornbos's pocket a small amount of marijuana worth around five dollars. After Doornbos was restrained, Officer Williamson said he went back and inspected the beer can. He testified that it was unopened, and he did not collect it as evidence.

Doornbos provided a very different account. He testified that he was not carrying a beer can at all. After he walked through the turnstile, he said, a man suddenly grabbed him: "I thought I was being robbed. So I started screaming for help, hoping someone would call the police." In fact, four people who saw or heard the incident called 911 and reported that a man was being attacked or robbed outside the station.

Doornbos's testimony regarding whether and when Officer Williamson said "stop" or "police" was not entirely consistent. During trial Doornbos emphasized that he "wasn't sure of the timing. It happened really fast." Doornbos initially testified at trial that he did not hear Williamson identify himself as an officer before being tackled. He later said that he heard "police" before being thrown to the ground, and then said that he did not hear "police." Doornbos also testified at trial that he might have heard "stop" after testifying that he actually did hear "stop." Doornbos testified that he was "not 100 percent sure" because the confrontation "happened very quickly."

Doornbos testified that he twisted his arm to get away from a man he thought

was attacking him, but as he was turning he was "tackled and thrown to the ground." He said that he was able to move only three to four steps before the three men in civilian clothes threw him down. After the men handcuffed him, Doornbos realized they were police officers and stopped resisting. He sustained minor injuries from the confrontation. He also testified that he was disoriented and upset after the sudden tackle, that one officer mocked him for crying, and that another officer made fun of his "fag" clothing.

### B. Criminal Prosecution and Trial

Doornbos was charged with resisting arrest and possession of cannabis. The cannabis charge was dismissed, and in June 2013 Doornbos went to trial on the charge for resisting arrest. Doornbos, Officer Williamson, and another officer at the scene testified at the trial. The court acquitted Doornbos, emphasizing that the officers provided inconsistent and "very unusual" accounts of the alleged beer can, which was never taken into evidence. The court also noted that the officers never told Doornbos he was under arrest or even asked to see the beer can:

> The defendant is charged with resisting arrest. There's no testimony to indicate the defendant was ever told he was under arrest by any police officer. If the beer can was closed and sealed as the officers suggest, there would be absolutely no reason to arrest the defendant at all. And there is no testimony of the officer approaching the defendant saying let's see the beer can, or is that beer can open or closed. So there's not even a question posed to the defendant regarding the status of the beer if that's the reason why the defendant is being stopped and detained at all.

Finally, the court emphasized that the officers were in plain clothes rather than in uniform, and Doornbos did not appear to know they were police officers: "it absolutely makes sense that anybody at the [train station] at that particular location grabbed by somebody could well think that he is being manhandled or potentially robbed which is consistent with what the defendant is alleged to have said, I'm being robbed." The court noted that if there were "any doubt" about whether Doornbos knew the men were police officers, it was dispelled by Doornbos's shouts for help and the officer's response: "the officer puts the badge in [Doornbos's] face because it was abundantly clear to the officer that he wasn't aware that they were police officers."

### C. Civil Lawsuit and Jury Trial

After Doornbos was acquitted on the criminal charge, he filed this civil suit under 42 U.S.C. § 1983 against the City of Chicago and the three officers: Michael Williamson, Alan Yakes, and Robert Capiak. The complaint alleged excessive use of force and failure to intervene in violation of the Fourth Amendment and malicious prosecution under Illinois common law. The case was tried to a jury.

During the pretrial proceedings, Doornbos filed a motion *in limine* to bar evidence that he possessed marijuana at the time of the arrest. He argued that it was not relevant under Federal Rule of Evidence 402 and that it was unfairly prejudicial under Rule 403. The district court denied his motion. It concluded that Doornbos's possession of marijuana was relevant because it was evidence that could corroborate either side's version of events. Evidence of the marijuana in Doornbos's pocket could help explain why he might have reacted in the way the officers alleged, i.e., attempting to flee and resisting arrest. The court concluded that whatever prejudice might result was minimal because it was such a small quantity

of marijuana. The court gave a limiting instruction, telling the jury to consider the marijuana "only in assessing whether the plaintiff knew that any of the defendants were police officers."

The parties also disputed the jury instructions. Defendants proposed the following instruction on investigatory stops: "A police officer is allowed to conduct a brief investigatory stop of a citizen, not rising to the level of an arrest, if the officer performing the stop has a reasonable suspicion that criminal activity is afoot." Doornbos objected, arguing that he had not alleged false arrest and that the instruction would cause confusion. The court gave the defendants' requested instruction. Doornbos in turn asked for an instruction on frisks to explain that an officer must have reasonable suspicion that a civilian is armed and dangerous to justify a frisk. Doornbos argued this was relevant because it addressed the overall reasonableness of the use of force, and it was necessary to supplement the instruction on investigatory stops. The court denied Doornbos's request: "taking your view of the facts that [the officers] did not have a basis to do a pat-down ... [t]hat says nothing about whether the force they used ... was excessive or not." The court concluded: "I don't know why we need any debate about the lawfulness of the pat-down or not. It's just not relevant to the question of whether the force ultimately was excessive. . . ."

During deliberations, the jury sent a note to the judge asking whether plainclothes police officers must identify themselves as officers when conducting investigatory stops. The judge sent the following response:

1. "Whether or not an officer must effectively identify themselves before conducting 'a brief investigatory stop of a citizen, not rising to the level of an arrest, if the officer performing the stop has a reasonable suspicion that criminal activity is afoot.'"

RESPONSE: An officer is not required to identify himself in order to conduct a "brief investigatory stop of a citizen, not rising to the level of an arrest, if the officer performing the stop has a reasonable suspicion that criminal activity is afoot."

2. "We would like to know how *effectively* an officer must identify himself."

RESPONSE: The effectiveness of an officer's identification of himself as a police officer is relevant to the issue of whether the plaintiff knew that the officer was, in fact, a police officer.

(Quotation marks and emphasis in original.)

Shortly after receiving the judge's answer, the jury returned a verdict in favor of defendants on all claims. Doornbos has appealed.

II. *Admission of the Marijuana Evidence*

Doornbos argues that the district court erred by admitting evidence of his possession of marijuana. He relies primarily on our decision in *Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir. 1988) (en banc), where we wrote that in excessive force cases we consider "only ... those circumstances known and information available to the officer at the time of his action." Because the officers did not know that Doornbos had marijuana at the time of the confrontation, Doornbos argues that the marijuana is not relevant to determine whether they used excessive force. In addition, Doornbos argues that despite any minimal relevance the marijuana might have had, it was outweighed by the potential for unfair prejudice.

■ We review for abuse of discretion evidentiary rulings that admit disputed evidence. *United States v. Bogan*, 267 F.3d 614, 620 (7th Cir. 2001). "A determination made by a trial judge regarding the admissibility of evidence 'is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding.'" *United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000), quoted in *Bogan*, 267 F.3d at 619. "A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012), quoting *Cerabio LLC v. Wright Medical Technology, Inc.*, 410 F.3d 981, 994 (7th Cir. 2005).

Under Federal Rule of Evidence 401, evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Relevant evidence may nonetheless be excluded when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

■ The district court did not abuse its discretion by admitting evidence that Doornbos possessed marijuana. In deciding excessive force claims, the issue is whether an officer's use of force was objectively reasonable given the information he or she knew at the time. See *Sherrod*, 856 F.2d at 804. The Supreme Court has recently reinforced this analysis.

> Our case law sets forth a settled and exclusive framework for analyzing whether the force used in making a seizure complies with the Fourth Amendment. . . . The operative ques-

tion in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure. . . . Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. *County of Los Angeles v. Mendez*, 581 U.S. ——, ——, 137 S.Ct. 1539, 1546–47, 198 L.Ed.2d 52 (2017) (citations and quotations omitted).

Although this framework governs excessive force claims, we have recognized that information unknown to the officer at the time of the conduct may be admitted for another purpose: if it tends to make one side's story more or less believable. For instance, in *Common v. City of Chicago*, 661 F.3d 940, 943 (7th Cir. 2011), the trial court admitted evidence that the deceased had swallowed bags of cocaine before his fatal confrontation with a police officer, even though the officer was unaware of the drugs at the time. We affirmed, noting that "where the facts are controverted in a reasonable force case, impeachment by contradiction is allowed." *Id.* at 946, citing *Sherrod*, 856 F.2d at 806. In that case, "evidence of the drugs secreted in Smith's airway made it more likely that Smith acted as Officer Nelson testified, as opposed to the manner in which plaintiffs' witnesses testified." *Id.*

A number of our cases allowing admission of facts unknown to officers have allowed them where they tended to support officers' versions of events. See, e.g., *Wilson v. City of Chicago*, 758 F.3d 875, 884–85 (7th Cir. 2014) (affirming admission of evidence that decedent had throwing knife strapped to his thigh even though information was unknown to officer at time of shooting); *Estate of Escobedo v. Martin*, 702 F.3d 388, 399–401 (7th Cir. 2012) (affirming admission of evidence of decedent's psychological profile, upcoming

court date, and potential prison sentence even though information was unknown to officer at time of shooting); *Common,* 661 F.3d at 946 (affirming admission of evidence of drugs hidden in decedent's airway despite officer's lack of knowledge).

■ We must note, however, that the logic and application of this rule applies with equal force to officers and civilians alike. If there is a factual dispute in a case alleging excessive force, information unknown to the officer at the time of the incident could be admitted if it tended to make the plaintiff's version of events more believable than the officer's account. For instance, suppose an officer mistakenly thought he saw a civilian with illegal drugs, and there is a factual dispute over whether the civilian fled when the officer approached. This logic implies the civilian-plaintiff should be able to show he did not have any drugs (and thus had no motive to flee the police). That information may have been unknown to the police, but it would support the plaintiff's testimony that he did not flee when the officer approached him.

In light of these precedents, evidence of Doornbos's marijuana was relevant because it could, at least arguably, support the officers' version of events by giving Doornbos a motive to try to flee and then to resist a stop, frisk, and/or arrest. This relevance was not overborne in this case by the potential for unfair prejudice. It was a very small amount of marijuana (a user quantity worth approximately five dollars), and our past cases have permitted more prejudicial evidence in similar contexts. See, e.g., *Wilson,* 758 F.3d at 884–85 (throwing knife); *Common,* 661 F.3d at 946–47 (bags of cocaine). Moreover, the district court properly included a limiting instruction to assure the jury considered the evidence only for its narrow permissi-

ble purpose. The district court's decision was not an abuse of its discretion.

### III. Jury Instructions on Stops and Frisks

Doornbos argues that the district court erred in two ways in its jury instructions on investigatory stops. He contends the court should have included an instruction on the legal standard for frisks, i.e., that an officer must have a reasonable suspicion that a person is armed and dangerous before initiating a frisk. Doornbos also argues that the court erred by telling the jury that a plainclothes officer need not identify himself as an officer when conducting a *Terry* stop (and implicitly when conducting a frisk).

■ "We consider a district court's jury instructions with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury." *Cruz v. Safford,* 579 F.3d 840, 843 (7th Cir. 2009), quoting *Aliotta v. Nat'l Railroad Passenger Corp.,* 315 F.3d 756, 764 (7th Cir. 2003). We review for abuse of discretion a district court's decision whether to give a particular jury instruction. *United States v. Villegas,* 655 F.3d 662, 669 (7th Cir. 2011), citing *United States v. Tavarez,* 626 F.3d 902, 904 (7th Cir. 2010). If an instruction is legally deficient, a new trial is required only if the flawed instruction could have confused or misled the jury causing prejudice to the complaining party. *Cruz,* 579 F.3d at 843. The risk that an incorrect jury instruction prejudiced a party depends at least in part on how closely balanced the evidence was at trial. *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1531 (7th Cir. 1990).

### A. Refusal to Include Instruction on Frisks

■ The Fourth Amendment protects individuals from "unreasonable searches

and seizures." For a search or a seizure to be reasonable, probable cause is generally required. See, e.g., *Ybarra v. Illinois*, 444 U.S. 85, 95–96, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Supreme Court established an important exception to this general rule in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where it "considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures." *Arizona v. Johnson*, 555 U.S. 323, 326, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

 The Court determined that a stop and a frisk are reasonable when two separate conditions are satisfied: "First, the investigatory stop must be lawful. That requirement is met ... when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, *to proceed from a stop to a frisk,* the police officer must reasonably suspect that the person stopped is *armed and dangerous.*" *Id.* at 326–27, 129 S.Ct. 781 (emphases added); see also *Huff v. Reichert*, 744 F.3d 999, 1009 (7th Cir. 2014); *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005) ("It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met."). To determine if the "reasonable suspicion" standard is satisfied, courts conduct "a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011) (quotation marks omitted).

 As with "seizures," an officer can initiate a frisk before physically touching a person. See, e.g., *Michigan v. Chesternut*, 486 U.S. 567, 573–74, 108 S.Ct. 1975,

100 L.Ed.2d 565 (1988) ("the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings."), also citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Stewart & Rehnquist, JJ.) (person is seized when, given all the circumstances, "a reasonable person would have believed that he was not free to leave"). A seizure can occur without any physical contact, such as when an officer makes certain displays of force like pointing a weapon or using language or a tone of voice that indicates compliance is mandatory. See *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177–78 (7th Cir. 1994), quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (Stewart & Rehnquist, JJ.). Taking the same approach with frisks, we ask when a reasonable person would have believed that the search was being initiated. This approach seeks to "assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut,* 486 U.S. at 573, 108 S.Ct. 1975.

 We conclude that the district court erred when it instructed the jury on the extent of a police officer's power to carry out investigatory stops but refused to include an instruction on frisks. Based on Officer Williamson's own version of events, he grabbed Doornbos to frisk him. Williamson testified that he announced himself as a police officer, and displayed his badge, handcuffs, and gun. He testified that he next went "to reach him, to reach with ... my left hand to his right side" to conduct a frisk "to make sure [Doornbos] did not have a weapon." Doornbos "pushed [Williamson's] hand away" and attempted to flee. Based on the totality of the circumstances, at least as told by Officer Williamson, a reasonable person could have believed he was being searched when Officer Williamson stretched his arm out. So too

could Doornbos when Williamson reached out to grab him. By instructing the jury on stops but not frisks, the court "insufficiently state[d] the law." *Cruz*, 579 F.3d at 843, citing *Aliotta*, 315 F.3d at 764.

The court's refusal to include the frisk instruction was a problem here because Officer Williamson's testimony suggests that the frisk was unjustified and thus unconstitutional. To "proceed from a stop to a frisk," Officer Williamson was required to have reasonable suspicion that Doornbos was "armed and dangerous." *Johnson*, 555 U.S. at 326–27, 129 S.Ct. 781. When asked why he suspected Doornbos was armed and dangerous, Williamson provided four reasons: it was a high-crime area, it was dark, Doornbos may have been breaking the law by drinking beer, and Doornbos was wearing a jacket with "deep pockets" in which he "could have hidden anything."

■ These were not sufficient "articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013), citing *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; see also *United States v. Carlisle*, 614 F.3d 750, 755 (7th Cir. 2010) ("During the stop, the officer may conduct a pat-down search to determine whether the person is carrying a weapon if the officer has an articulable suspicion that the subject is armed and dangerous."). As a reminder, Officer Williamson approached Doornbos at 7:30 p.m. in February right outside the train station. Three of Officer Williamson's factors are so general they would have applied to everyone at the station. It was dark in a high-crime neighborhood, and people were wearing big coats with deep pockets because it was February in Chicago. Without more, such justifications are too general because they could be applied to practically any person that had been around the area when the officers showed up that night. Indeed, similar facts could support a search of practically anyone who happens to be near a high-crime area at night when police are called. That is the very evil that the *Terry* court was concerned with unleashing, and the reason that the *Terry* court restrained the ability to frisk.

*Williams*, 731 F.3d at 688, citing *Terry*, 392 U.S. at 17–18, 88 S.Ct. 1868. Although the danger of a neighborhood is relevant, more is required to justify a frisk: "Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n.2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (applying *Terry* principles to protective sweep of home).

Nor does suspicion that Doornbos might have been drinking a beer on Chicago Transit Authority property transform these general factors into reasonable suspicion that he was "armed and dangerous." Officer Williamson testified that he did not even see Doornbos drink the beer. Nor did he testify that Doornbos appeared intoxicated or otherwise acted erratically in a way that might indicate dangerousness. There was no indication that Doornbos might be armed. Our precedent requires stronger facts to justify a frisk even in an otherwise justified *Terry* stop. See, e.g., *Williams*, 731 F.3d at 686–89 (no reasonable suspicion to justify frisk when officers responded to 911 call reporting weapons in high-crime neighborhood, defendant's group avoided eye contact with officers and moved away from them, defendant had hands in his pocket or near waistband); see also *Sibron v. New York*, 392 U.S. 40, 45, 63–64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (no reasonable suspicion to justify frisk

when officer observed defendant talking late at night with persons known to be addicted to drugs, and defendant reached his hand into his pocket when questioned by officer).

In sum, Officer Williamson's own testimony suggests that he initiated an unlawful frisk while policing in plain clothes, and that conduct proximately caused the violent confrontation. This information was relevant for the jury in assessing whether Williamson's use of force was reasonable under the "totality of the circumstances." *Mendez*, 581 U.S. at ——, 137 S.Ct. at 1546 (quotation omitted). The court's decision not to include an instruction on frisks deprived the jury of the law it needed to reach a sound verdict.[1]

■■■ To be clear, we do not suggest that an unlawful frisk somehow trumps the excessive force analysis outlined in *Mendez* and *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Supreme Court has barred that order of operations: *"once a use of force is deemed reasonable under Graham, it may not be found unreasonable by reference to some separate constitutional violation." Mendez*, 581 U.S. at —— n*, 137 S.Ct. at 1547 n* (emphasis in original). However, when assessing the "totality of the circumstances" under *Graham*, the *Mendez* Court expressly left open the possibility of "taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id.* And that is our approach here. When an officer's unreasonable (and unconstitutional) conduct proximately causes the disputed use of force, that conduct is part of the "totality

of the circumstances" that should be considered to determine if the use of force was reasonable, especially since the officers here were not in uniform.

### B. Officers' Duty to Identify Themselves as Police

■■■ The absence of an instruction on frisks was aggravated by the district court's response to the jury's note during deliberations. The jury asked if a police officer must identify himself as an officer during a stop. The court responded with a categorical "no," saying that an "officer is not required to identify himself" to conduct a stop. This answer sweeps too far. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Although some unusual circumstances may justify an officer's failure to identify himself in rare cases, it is generally not reasonable for a plainclothes officer to fail to identify himself when conducting a stop.

We addressed this issue in *Catlin v. City of Wheaton*, 574 F.3d 361 (7th Cir. 2009), where we expressed our concern about plainclothes officers failing to identify themselves, but we held that it can be a reasonable tactic where the act of identifying themselves could itself reasonably be thought to have made the situation more dangerous. In *Catlin*, the police were searching for a dangerous drug kingpin. They were told his arrest warrant was for the highest class of felony, that he was "armed and dangerous, that he had resisted arrest on several prior occasions and

---

1. Imagine a more exaggerated Fourth Amendment example, where the factual dispute is whether an officer stopped a person on the sidewalk or instead followed him into his home without a warrant and conducted the stop there. Under these circumstances, it would be misleading to instruct the jury only

on investigatory stops but to refuse to include an instruction on warrantless entries into the home. That is analogous to what occurred here. The jury was instructed on stops, but not on the legal standard that would have enabled it to recognize whether the frisk was lawful.

that he had threatened violent resistance if the police attempted to re-arrest him." *Id.* at 363. The officers were dressed in plain clothes. They mistakenly thought they saw the suspect on a motorcycle at a stop light. The officers rushed the motorcycle rider and tackled him, all without identifying themselves (or so we assumed for purposes of the appeal). The motorcycle rider, plaintiff Catlin, resisted. The struggle continued after the initial tackle, and the officers still did not identify themselves. After Catlin was restrained, the officers checked his identification and realized they had arrested the wrong person. *Id.* at 364.

In *Catlin,* we noted the dangers of this tactic by plainclothes officers, which creates a serious risk that a civilian would "think that he was being attacked by common criminals and ... *this would make him more likely to resist.*" *Id.* at 368 (emphasis added). We concluded, however, that because of the unusually dangerous character of the suspect, the officers reasonably thought that identifying themselves before tackling the motorcyclist would have made the arrest more dangerous. The suspect was armed, had a history of violence, and had professed his intent to resist arrest. See *id.* at 365–66, 368. Given these factors, the officers "could have reasonably concluded that they needed to use the element of surprise to their advantage." *Id.* at 368. We also found that the mistaken identity was reasonable under the circumstances.

We considered it more "problematic," however, that the officers still did not identify themselves after tackling Catlin, and we noted that police officers "who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force." *Id.* at 368 n.7, quoting *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir. 1993). Nonetheless we concluded

the unlawfulness of that behavior had not been clearly established, so the officers were protected by qualified immunity. See *Catlin,* 574 F.3d at 369.

*Catlin* shows that certain dangerous circumstances may permit plainclothes officers to initiate stops without identifying themselves, but that is and must remain a rare exception, not the rule. Failure to identify during a stop can be a tactic. As with all police tactics, its reasonableness depends on the circumstances. See, e.g., *United States v. Bullock,* 632 F.3d 1004, 1016 (7th Cir. 2011) ("We have previously found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances."), citing *United States v. Tilmon,* 19 F.3d 1221, 1224–25, 1228 (7th Cir. 1994); see also *Wilson v. Arkansas,* 514 U.S. 927, 936, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) (compliance with common-law rule requiring officers to "knock and announce" before executing search warrant is relevant to reasonableness of search, but rule yields in face of threat of physical violence or destruction of evidence); *Leaf v. Shelnutt,* 400 F.3d 1070, 1086 (7th Cir. 2005) (protective sweep of home is "a search tactic [that] may be 'reasonable when weighed against the need for law enforcement officers to protect themselves and other prospective victims of violence'"), quoting *Buie,* 494 U.S. at 332, 110 S.Ct. 1093.

Absent reasonable grounds to think that identification would present an unusual danger, it is generally not a reasonable tactic for plainclothes officers to fail to identify themselves when conducting a stop. The tactic provokes panic and hostility from confused civilians who have no way of knowing that the stranger who seeks to detain them is an officer. This creates

needless risks. Suppose you are walking along a street and are grabbed by a stranger (or three strangers). A fight-or-flight reaction is both understandable and foreseeable. Cf. *Hudson v. Michigan*, 547 U.S. 586, 594, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (knock-and-announce rule is reasonable, in part, because it protects "human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident"). "Self-defense is a basic right," *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), and many civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted—let alone grabbed—by an unidentified person who is not in a police officer's uniform. Absent unusual and dangerous circumstances, this tactic is unlikely to be reasonable when conducting a stop or a frisk.

This result is further supported by analogy to tort law. Unless the officer was lawfully exercising his authority as a police officer, he was committing the torts of assault and then battery. Officer Williamson initiated the search by reaching out with his hand and putting Doornbos in "imminent apprehension" of an "offensive contact." Restatement (Second) of Torts § 21 (Am. Law Inst. 1965); see also William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821 (2016) (analyzing reasonableness of Fourth Amendment searches and seizures

through private law concepts, such as tort law). If the officer does not identify himself as an officer, what can a civilian think when the person grabbing him is in civilian clothes? [2]

Other courts have resolved this issue similarly. In *Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013), the Eighth Circuit reversed summary judgment that had been granted in favor of a plainclothes officer who had tackled and injured plaintiff Atkinson without first identifying himself as an officer. Atkinson had intervened to stop a fight at his nephew's high school football game. The plainclothes officer became angry when Atkinson physically separated him from one of the fighters. *Id.* at 1205. Without identifying himself, the plainclothes officer said "I'll take care of you," and took out his cell phone. Atkinson thought he was calling for "reinforcements," so he took the man's phone without touching him and said, "Why can't you just talk to us?" *Id.* At that point, the plainclothes officer charged at Atkinson and seriously injured him. The Eighth Circuit held that a "reasonable officer … would not have thought it appropriate to charge Atkinson without *first* identifying himself as a law enforcement official and giving Atkinson a chance to return the cell phone peacefully. By remaining anonymous, [the officer] never gave Atkinson the opportunity to comply with a legitimate request by a law enforcement official." *Id.* at 1210. (Emphasis in original.) Several other courts have ruled likewise in comparable cases.[3]

2. Here we address stops. Of course, consensual encounters with law enforcement do not implicate the Fourth Amendment's restrictions on stops. See, e.g., *United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988) ("[I]f an encounter with the police is not coercive, the Fourth Amendment is not in play in even an attenuated form and the offi-

cer is not required to demonstrate that he had even an articulable suspicion.").

3. See, e.g., *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) ("It was not 'objectively reasonable' for [Officer] Currie to enter the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat.

Because it is usually unreasonable for a plainclothes officer to fail to identify himself when conducting a stop or frisk, the district court's categorical answer to the jury's note did not "accurately state the law." See *Cruz*, 579 F.3d at 843, quoting *Aliotta*, 315 F.3d at 764. Moreover, the exceptional facts of *Catlin*—the dangerous drug kingpin who had threatened to resist any arrest—could not apply to Doornbos, who was suspected of drinking a beer on Transit Authority property. The officer did not have reasonable suspicion that Doornbos was armed and dangerous. In this situation it would not have been reasonable for a plainclothes officer to initiate a stop and frisk without first identifying himself as a police officer. There was no apparent need to use the element of surprise, and that tactic would needlessly increase the danger of the stop for everyone present.

Whether officers reasonably identify themselves in initiating stops is particularly important for the Chicago Police Department because of its widespread use of plainclothes policing. A recent investigation by the United States Department of Justice found that Chicago Police engage in aggressive plainclothes policing practices that result in needless injuries. See U.S. Dep't of Justice, Civil Rights Div. & U.S. Attorney's Office N.D. Ill., Investigation of the Chicago Police Department (Jan. 13, 2017), available at https://www.justice.gov/opa/file/925846/download.[4]

---

Thus, because the right Officer Currie is alleged to have violated was clearly established, and because Officer Currie's actions preceding the shooting were not those of an objectively reasonable police officer, we conclude that qualified immunity is not appropriate."); *Newell v. City of Salina*, 276 F.Supp.2d 1148, 1154 (D. Kan. 2003) (holding that officers' alleged use of force on an intoxicated pedestrian "without having identified themselves as law enforcement officers, may not be objectively reasonable" for qualified immunity purposes); *Johnson v. Grob*, 928 F.Supp. 889, 905 (W.D. Mo. 1996) ("[A] seizure outside the home may be unreasonable because the officers involved were not identified or identifiable as such, and the seized person suffers injuries because of the officers' lack of identification."); see also *St. Hilaire v. City of Laconia*, 71 F.3d 20, 25, 28 (1st Cir. 1995) (plainclothes officers executed search warrant with weapons drawn, failed to identify themselves, then shot plaintiff in the neck when he reached for his gun because he thought he was being attacked; court noted the claim "raises difficult issues" but concluded it was not "clearly established" for qualified immunity purposes that plainclothes officers with a warrant had to identify themselves).

4. Chicago is not alone in this regard. See, e.g., U.S. Dep't of Justice, Civil Rights Div., Investigation of the Baltimore City Police Department, at 45 (Aug. 10, 2016), available at https://www.justice.gov/crt/file/883296/download ("During the course of our investi-

gation, we received a large number of anecdotes specifically identifying plainclothes officers enforcing violent crime and vice offenses ... as particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches. A disproportionate share of complaints likewise accuse plainclothes officers of misconduct."); U.S. Dep't of Justice, Civil Rights Div., Findings Letter on Albuquerque Police Department, at 14 (April 10, 2014), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/04/10/apd_findings_4-10-14.pdf (plainclothes officer failed to identify himself, then officer shot and killed unarmed man who "did not pose a threat of death or serious physical injury to the officer or anyone else"); U.S. Dep't of Justice, Civil Rights Div. & U.S. Attorney's Office D. N.J., Investigation of the Newark Police Department, at 14, 25 (July 22, 2014), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/07/22/newark_findings_7-22-14.pdf (civilian complaint that plainclothes officer stopped two individuals, one of whom did not know that the plainclothes officer was police; struggle ensued); *id.* at 24 (plainclothes officer "startled [a] man with his sudden presence behind him" and man swung at plainclothes officer; officer then struck man multiple times in the face with closed fist leaving man with concussion, loss of consciousness, and bruises); U.S. Dep't of Justice, Civil Rights Div. & U.S. Attorney's Office N.D. Oh., Investigation of the Cleve-

In Part II.A.4 of the Department of Justice Report, titled "CPD Officers Make Tactical Decisions that Unnecessarily Increase the Risk of Deadly Encounters," investigators "observed a trend in shootings resulting from CPD officers unnecessarily escalating confrontations or using reckless, untrained tactics, putting themselves in a position of jeopardy and limiting their force options to just deadly force." *Id.* at 28.

One of the tactics in question is called a "jump out," which "involves groups of officers, frequently in plain clothes and riding in unmarked vehicles driving rapidly toward a street corner or group of individuals and then jumping out and rapidly advancing, often with guns drawn." *Id.* at 31. The officers then "zero-in on the fleeing person," and give chase. *Id.* The Report explains:

> Such techniques can be particularly problematic when deployed by CPD tactical

or other specialized units using unmarked vehicles and plainclothes officers. It can be difficult, especially at night, to discern that individuals springing out of an unmarked car are police officers. In high-crime areas, residents may be particularly unwilling to stick around to find out. For example, in one case, a tactical officer in plain clothes jumped out of an unmarked car, chased a man who ran from him, and ultimately shot the man from behind. Officers claimed the man pointed a gun, but no weapon was recovered. The shooting victim explained to investigators that he ran because a sedan he did not recognize had raced through a stop sign and headed toward him. Similarly, in another case, two plainclothes officers dressed in black and in unmarked vehicles approached a man and his female passenger as they were getting into their car. According to the woman, the couple did

---

land Division of Police, at 18 (Dec. 4, 2014), available at https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/04/cleveland_division_of_police_findings_letter.pdf (officer dressed in civilian clothes drew weapon and identified himself as police officer, but did not show badge even after civilian "asked repeatedly for the officer to show his badge and expressed disbelief that he was an officer"; civilian in the car "thought they were being robbed"; struggle ensued and civilian was injured); U.S. Dep't of Justice, Civil Rights Div., Investigation of the Puerto Rico Police Department, at 24 (Sept. 5, 2011), available at https://www.justice.gov/sites/default/files/crt/legacy/2011/09/08/prpd_letter.pdf (plainclothes officers wielding firearms surrounded civilian, causing him to flee and sustain injury when captured; federal civil rights trial found officers liable for violating Fourth Amendment and plaintiff was awarded $100,000 in damages); *id.* at A-4 (plainclothes officer failed to identify himself, resulting in shooting of civilian who thought he was being attacked); see also Justin Fenton & Tim Prudente, *Commissioner Davis Says Plainclothes Policing in Baltimore Is Over*, Baltimore Sun (Mar. 8, 2017), http://

www.baltimoresun.com/news/maryland/crime/bs-md-ci-plain-clothes-policing-ends-20170308-story.html (Police Commissioner dismantled plainclothes policing unit; noted that plainclothes officers are "officers most likely to be the subject of complaints"); Aubrey Whelan, *Shooting of Deliveryman Results in Largest Police Settlement in City History*, Philly.com (Jan. 7, 2017), http://www.philly.com/philly/news/20170107_breaking_local.html (city agreed to reform plainclothes policing practices after two plainclothes officers failed to identify themselves and shot a student who panicked when he thought he was being attacked by armed assailants); Clarence Williams & Peter Hermann, *Lanier Eliminates Many Plainclothes Drug Units to Focus on Top Dealers*, Wash. Post (June 12, 2015), https://www.washingtonpost.com/local/crime/lanier-eliminates-many-plainclothes-drug-units-to-focus-on-top-dealers/2015/06/12/633706fe-10ff-11e5-a0dc-2b6f404ff5cf_story.html (noting that "critics have complained that in the District [of Columbia], plainclothes officers jump from unmarked cars to roust suspected people, innocent and not, on street corners" and Police Chief noting she wants "police to be identifiable when making arrests").

not know they were officers and fled, and an officer shot at the side and rear of the vehicle, killing the man.

*Id.* at 31; see also *id.* at 35 (plainclothes officer detained twelve-year-old boy without identifying himself as police officer; "boy reported he did not understand the man was a police officer or why he was being detained and told the officer he was only 12").

The Department of Justice Report also documents how these tactics foster resentment in the community and erode trust in law enforcement. See *id.* at 142. The Supreme Court warned of that danger in *Terry* itself. Far from a "petty indignity," Chief Justice Warren wrote for the Court, a stop and frisk is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U.S. at 17, 88 S.Ct. 1868. The Court explained that "the degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security caused by those practices." *Id.* at 17, n.14, 88 S.Ct. 1868, citing. *id.* at 14–15, n.11, 88 S.Ct. 1868, citing in turn President's Comm'n on Law Enforcement and Administration of Justice, Task Force Report: The Police 183–84 (1967). This threat to police-community relations reinforces our conclusion that, absent unusual reasons to think the act of identification will itself be dangerous, as in *Catlin*, it is not reasonable for plainclothes officers to fail to identify themselves when conducting a *Terry* stop, with or without a frisk.

## C. *Prejudice*

Though we find errors in instructing. the jury, we should not order a new trial unless the errors prejudiced Doornbos. *Aliotta*, 315 F.3d at 764. Defendants argue that Doornbos was not prejudiced because his account at trial was impeached based on his earlier deposition testimony and a comment he wrote on his Facebook account. This argument is not persuasive for three reasons.

First, both sides' accounts suggest that Officer Williamson's initial contact with Doornbos was unreasonable and unlawful. Doornbos's account describes clearly unlawful conduct. And as explained above, even Officer Williamson's account—he reached out to initiate a frisk—was likely unlawful because the evidence does not support a reasonable suspicion that Doornbos was armed and dangerous. If the jury had known that, based on either account, the disputed use of force followed directly from Officer Williamson's unlawful conduct, there is a reasonable possibility that the jury would have viewed the reasonableness of the force differently.

Second, while it is true that Doornbos had credibility problems, so did Officer Williamson. As noted by the state court in the criminal case, the officers' versions of events were not entirely consistent, and the allegations surrounding the beer can were "very unusual." The can was never taken into evidence, and neither the records from the four 911 calls (from bystanders who thought Doornbos was being robbed) nor the trial testimony of two of those callers say anything about a beer can that Officer Williamson said "ruptured" and "was spraying all over the place."

In addition, Officer Williamson initially testified at trial that he intended only to stop Doornbos when he approached him to investigate the beer can. After Doornbos's counsel impeached Williamson with his earlier deposition testimony, however, Williamson acknowledged that he had already decided to conduct a frisk when he approached Doornbos. Additionally, his testimony at trial was not fully consistent with

his testimony at Doornbos's criminal trial regarding whether he tackled Doornbos alone or with the help of the other two officers. These chinks in the armor matter because the trial was ultimately a credibility contest. We do not attempt to resolve these issues, but they help to show that the evidence was not so lopsided that we could find no prejudice from the instruction errors. See *Village of Bellwood*, 895 F.2d at 1531.

Third, the jury's note signals that, contrary to the defense argument, the impeachment of Doornbos did not decide the credibility contest. If the jurors all thought Doornbos had been thoroughly discredited, there would have been no need for the note. By sending the note, the jury showed that it was carefully considering both accounts, and in particular, how the confrontation began.

The district court erred in its jury instructions and its response to the jury's note, and these errors prejudiced Doornbos. Accordingly, we VACATE the judgment in favor of defendants and REMAND for a new trial.