In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-1557

KASEY BURTON,

*Plaintiff-Appellant,*

*v.*

CITY OF ZION, LAKE COUNTY, ILLINOIS, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-10486 — **Sheila Finnegan**, *Magistrate Judge.*

———————————

ARGUED JANUARY 16, 2018 — DECIDED AUGUST 24, 2018

———————————

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. On March 13, 2014, Kasey Burton was driving to pick up her roommate's niece for a barbeque.[1] Unbeknownst to her, her license was suspended. Officer Jonathan Meyers, a City of Zion police officer, however, had

———————————

[1] We report only the undisputed facts. The minor factual disputes are not relevant to the motion in limine at issue in this appeal.

learned the news in that day's "hot sheets" (a list of items of current interest to police). After he spotted her driving, he verified by radio that the police had an active warrant for her arrest for driving on a suspended license, and then pulled behind Burton's van and activated his squad car's emergency lights. Burton saw the flashing lights and heard the siren and knew that an officer wanted to pull her over, but according to her testimony at trial, Burton was afraid to pull over because of her experience with a Zion police officer five and a half years earlier, in 2008. During that earlier incident, Zion police officer Joseph Richardt pulled Burton over for operating a vehicle with sound amplification. By the end of that stop, Officer Richardt had handcuffed Burton and then, while she was handcuffed, used a taser to stun her. Burton filed a citizen's complaint against Officer Richardt and, after an internal investigation, the Zion Police Department sustained the allegations of unnecessary force. Burton filed a federal lawsuit against the City of Zion, Officer Richardt, and other officers and eventually reached a settlement with the City.

Burton testified that this prior incident was on her mind and that she was afraid of the police when Officer Meyers tried to pull her over. As a result, she said, she did not immediately comply with Officer Meyers' request for a stop, but instead drove her car toward her home while following all speed limits and traffic laws, where she knew she could exit her car with friendly witnesses watching. The officers also testified that they knew that Burton was heading to her house.

As she was driving home, Officer Richardt, the same officer who had been involved in the incident with Burton before, joined the pursuit, also activating his lights and siren, followed by a third officer in a third squad car, Sergeant

Duane Arrington. At some point, Sergeant Arrington maneuvered his car in front of Burton's to get her to stop, but she merely turned left and continued to drive, still following all speed limits and traffic laws, until she reached her driveway.

Burton arrived at her home and stopped her van near her friend, Dale Wells, who was with his pit bull. Officer Meyers stopped behind Burton's van and as he approached the driver's side door, Burton exited through the passenger-side door because, she alleged, the driver's side door was not functioning. Officer Richardt saw Burton exit the van and ran toward her commanding her to get on the ground. Officer Richardt brought Burton to the ground but did so by incorrectly executing a "straight-arm take down." As they were on the ground, the pit bull jumped on top of Officer Richardt and bit his leg, but immediately released it without causing damage. Sergeant Arrington placed his knee on Burton's back as he handcuffed her then dragged her away. Burton's suit alleged that as a result of the incident, she suffered with pain for a month.

Burton sued the City of Zion, Officer Richardt, and Sergeant Arrington, under 42 U.S.C. § 1983, claiming that the officers used excessive force in executing her arrest in violation of her Fourth Amendment rights.[2] Prior to trial, each party filed motions in limine, including the one at issue here, in which the City of Zion asked that any evidence regarding Burton's 2008 encounter with Officer Richardt be omitted from evidence. The district court granted the defendants' motion, thus removing any evidence of the 2008 encounter from

---

[2] The parties consented to the exercise of jurisdiction by the magistrate judge.

the jury's consideration. In other words, the jury heard testimony about and saw video of the 2014 stop, including Burton's failure to stop, her slow drive home, and the arrest itself, but nothing about her prior experience with Officer Richardt. Burton filed a motion for reconsideration, but that too was denied. R. 118. After a three day trial, the jury found in favor of the defendant officers and City of Zion. Burton now appeals, arguing that the district court erred in its order on the motion in limine by disallowing the evidence of her 2008 encounter with Officer Richardt.

## I.

District courts have broad discretion in ruling on motions in limine, and we review such a ruling only for an abuse of discretion." *DiPerna v. Chicago Sch. of Prof'l Psychology*, No. 17-3351, 2018 WL 3121236, at *6 (7th Cir. June 26, 2018). We show great deference for a district court's evidentiary rulings. *Holder v. Ill. Dep't of Corr.*, 751 F.3d 486, 493 (7th Cir. 2014). Even if we find an abuse of discretion, "[a] new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Arrigo v. Link*, 836 F.3d 787, 794 (7th Cir. 2016) (citation omitted). In other words, there must be a significant chance that the flawed ruling affected the outcome of the trial. *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 634 (7th Cir. 2018). Burton need not show that on remand a jury will come out the other way. *United States v. Richards*, 719 F.3d 746, 765–66 (7th Cir. 2013). She need only show that an average juror would have found the omitted evidence persuasive. *United States v. Miller*, 673 F.3d 688, 700 (7th Cir. 2012).

The district court granted the defendants' motion in limine after concluding that the evidence of the prior stop was propensity evidence—evidence that Officer Richardt acted in accordance with the character of someone who uses excessive force—and, therefore under Federal Rule of Evidence 404(b), it could not be admitted. This federal rule sets forth the prohibited and permitted uses of prior acts as follows (In this case, the controverted prior act is not criminal in nature, but rather a civil wrong):

> **(b) Crimes, Wrongs, or Other Acts.**
>
> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses; Notice in a Criminal Case.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b).

In order to delve into an analysis under Rule 404(b), we need to explore the nature of Burton's case, that is, what she was trying to prove, and thus for what purpose the evidence might have been relevant. This case alleges excessive force by a law enforcement officer so, in order to be relevant, all evidence must make it more or less probable that the officers' force was reasonable. See Fed. R. Evid. 401.

Burton accused Richardt of using excessive force as she exited her van. Whether the amount of force an officer used is

excessive or reasonable turns on the "facts and circumstances of each particular case." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The standard of reasonableness for a police officer in an excessive force case is "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The Supreme Court case law on excessive force has emphasized that the assessment as to whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted). In sum, the knowledge of the officer is a critical inquiry in any assessment of reasonable force.

In this case, the district court looked at the prior bad act—Officer Richardt's 2008 stop of and use of a taser against Burton—and analyzed it using this court's four-part test to determine whether prior-act evidence was admissible. That is, the court looked to see whether

> (1) the evidence is directed toward establishing a matter in issue other than the [defendant's] propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the

> matter in issue, (3) the evidence is sufficient to
> support a jury finding that the [defendant] com-
> mitted the similar act, and (4) the probative
> value of the evidence is not substantially out-
> weighed by the danger of unfair prejudice.

D. Ct. Order, R. 116 at 9–10, citing *United States v. Vargas*, 689
F.3d 867 (7th Cir. 2012).[3] Using this framework as a guide, the
district court determined that the evidence of the prior act
could not be admitted to show Burton's fearful state of mind,
because using an objective standard of reasonableness from
the officer's point of view, her state of mind was not relevant
to the question of whether a police officer used excessive
force. R. 116 at 10. The officers could not have known what
was going through Burton's mind, the district court ex-
plained, and therefore her fearful state of mind was not rele-
vant to the assessment of reasonableness. *Id.*

Likewise, the district court reasoned that the evidence
could not have been relevant to show the totality of the cir-
cumstances either because, again, Officer Richardt could not

---

[3] The plaintiff included only the first paragraph and piecemeal selections
of the District Court's underlying order (R. 116) in the short appendix. Cir-
cuit Rule 30(a) requires that "The appellant shall submit, bound with the
main brief, an appendix containing the judgment or order under review
and any opinion, memorandum of decision, findings of fact and conclu-
sions of law, or oral statement of reasons delivered by the trial court or
administrative agency upon the rendering of that judgment, decree, or or-
der." For clarity we note, although including only relevant portions of
transcripts or other records is permissible, the parties should include the
orders from which they are appealing in their entirety rather than just the
particular parts that are referenced in the brief. The entire order, including
the portions not appealed, allows an appellate court to have context for
the appeal.

have known that Burton must have been afraid of him and therefore the evidence could only be used for impermissible propensity purposes—to show that he likely used excessive force because he had done so before. *Id.* at 11. Finally, the district court concluded that the prior incident was "neither sufficiently similar nor close in time to be probative," noting that the prior incident had occurred some five and a half years before the current arrest, that it involved different initiating officers, that she was pulled over for different infractions, and that Officer Richardt's alleged excessive force in 2008 involved a taser rather than a "takedown." *Id.* at 11–13.

Having evaluated the facts through the lens of the four-part test, the district court granted the defendant's motion in limine, barring any mention of the evidence of Burton's prior encounter with Officer Richardt as propensity evidence. *Id.* at 13. The jury would never hear that five years earlier, Officer Richardt had fired a taser at Burton while she was handcuffed.

The problem, however, is that this court eschewed that four part test three years prior to the district court's order, "abandon[ing] it in favor of a more straightforward rules-based approach." *United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014). The decision in *Gomez* stated that the change is "less a substantive modification than a shift in paradigm." *Id.* This is true in the sense that the former test was legitimate to the extent that it reflected the requirements of the Federal Rules of Evidence. But, we noted, using the test allowed for the possibility that "misapplication of the law can creep in." *Id.* In other words, legal error was a possibility because "some aspects of [the previous] test lack[ed] an adequate basis in the rules." *Id.* Thus we warned that using the test could lead to

error if the test was used too rigidly, as a "straightjacket," or if it was used in a way that was not supported by the Federal Rules of Evidence. *Id.* at 854–55.

After rejecting the four-part test of *Vargas*, (and, by extension, *United States v. Zapata*, 871 F.2d 616, 620 (7th Cir. 1989), and *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir. 1984)) we set forth a new framework that weighs the relevance of other-act evidence directly, using the Federal Rules of Evidence as a guide. Under that framework,

> to overcome an opponent's objection to the introduction of other-act evidence, the proponent of the evidence must first establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way. *See* Fed. R. Evid. 401, 402, 404(b). Other-act evidence need not be excluded whenever a propensity inference can be drawn. But its relevance to "another purpose" must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case. If the proponent can make this initial showing, the district court must in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great. The court's Rule 403 balancing should take account of the extent to which the

> non-propensity fact for which the evidence is
> offered actually is at issue in the case.

*Gomez*, 763 F.3d at 860.

Although some of the changes between the four-part test the district court used and the new rules-of-evidence-based test reflect more of a change in process than substance, in other ways *Gomez* altered the framework in ways that are significant to the outcome of this case. Specifically relevant to this case, *Gomez* rejected the rigid application of the rule requiring a court to look at the similarity and recency of the prior act. Instead, we noted that if we look more generally to the Federal Rules of Evidence to guide our analyses,

> the need to check for similarity and recency may
> be substantially diminished or nonexistent de-
> pending on the particular purpose for which the
> evidence is offered. In some cases the relative
> similarity of the other act to the charged offense
> may be unimportant as a test of relevance. … It's
> far too tempting to stop at superficial compari-
> sons without meaningfully analyzing how the
> similarity and recency of the prior bad act affect
> its relevance in the unique circumstances of the
> case. And the similarity and timing of the other
> act may not bear on the relevance question at all.

*Id.* at 854 (internal citations omitted). In short, sometimes similarity or recency or both will be relevant to the inquiry and sometimes they will not. If they are not, then a court may not reject the evidence based on a lack of similarity or recency. In this case, they were not relevant.

The district court erred, therefore, by applying a legal test this court has rejected and by rigidly applying the similarity and recency rule to find that the prior incident was "neither sufficiently similar nor close in time to be probative." R. 116 at 11. The district court found that the prior incident had occurred some five and a half years before the March 2014 arrest, that it involved different initiating officers, that Burton was pulled over for different infractions, and Officer Richardt's alleged excessive force in 2008 involved a taser rather than a "takedown." But the district court erred by clinging too tightly to the requirements of similarity and recency, as the need to check for these "may be substantially diminished or non-existent depending on the particular purpose for which the evidence is offered." *Gomez*, 763 F.3d at 854. This is just such a case. As we will explain below, the only reason for which the prior incident would have been relevant was to show Officer Richardt's knowledge—to prove that Officer Richardt knew that Burton had a previous frightening and painful encounter with the police, and not to show that Officer Richardt has a tendency to use excessive force. The similarity between the prior incident and this one, therefore, was not relevant. And for the same reason, recency would only matter if, in fact, the prior incident had happened so long ago that Officer Richardt could not have remembered it. We think this unlikely. After the prior incident, the City investigated and sustained the allegations that Officer Richardt used unnecessary force. Burton filed a federal lawsuit with Officer Richardt as the named defendant which the City eventually settled. It seems the type of event he was unlikely to have forgotten, even after five and a half years.

As we have just foreshadowed, we must now turn to the theory of this particular case and evaluate the potential uses

of the evidence using the proper framework, the one set forth in *Gomez*, to see for what purpose the prior stop may have been used.

When evaluating the reasonableness of a police officer's use of force, the key question is "what the officer knew at the time." *Kingsley*, 135 S. Ct. at 2473. A plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances. *Graham*, 490 U.S. at 396–97. Reasonableness depends on the facts and circumstances confronting an officer at the time. *Kisela*, 138 S. Ct. at 1152. And, as the Supreme Court and this court have emphasized again and again, a court must consider "the amount and quality of the information known to the officer at the time." *Horton v. Pobjecky*, 883 F.3d 941, 949–50 (7th Cir. 2018) (citation omitted). See also *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) ("Excessive force claims … are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.") citing *Saucier v. Katz*, 533 U.S. 194, 207 (2001); *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017) ("In deciding excessive force claims, the issue is whether an officer's use of force was objectively reasonable given the information he or she knew at the time."); *Common v. City of Chicago*, 661 F.3d 940, 943 (7th Cir. 2011) ("A jury must stand in the shoes of an officer and judge the reasonableness of his actions based on the information he possessed.").

Thus, the entire question in an excessive force case boils down to this: Was the officers' force, in light of the facts and circumstances before them and known to them at the time, reasonable. Because the keystone question in this case was

what the officers knew at the time, it is true, as the district court reasoned, and the defendants argue on appeal, that the 2008 taser incident was not relevant to, and therefore should not have been admitted to show, Burton's state of mind. The only relevant inquiry is whether Officer Richardt used excessive force based on the perspective of the reasonable officer on the scene, knowing what Richardt knew and hearing and observing what Richardt did. *Mendez*, 137 S. Ct. at 1546–47. Nor could the evidence be admitted to demonstrate Officer Richardt's subjective intent when he arrested Burton, as the subjective intent of an officer making an arrest is not relevant to an excessive force claim. *Kingsley*, 135 S. Ct. at 2473.

Although neither Burton's state of mind nor Richardt's subjective intent were relevant, Officer Richardt's knowledge at the time certainly was. The fact that Burton had previously been subjected to excessive police force was one of the facts and circumstances known to Officer Richardt and to the officer who stopped her, Officer Meyer. See R. 68-4 at 17. And it would be hard to imagine that this knowledge was not running through their minds as they assessed the situation. The knowledge was indeed critical. It explained why Burton did not immediately stop. It explained why she would drive to a familiar place with friendly witnesses. It explained why she might exit the car away from the officers.[4] It surely would have been a known fact and circumstance that a reasonable officer would have put in the mix when assessing the level of force required to subdue her. In other words, the officers had some information about why Burton may not have stopped

---

[4] Burton testified that the driver's side door was broken and would not open. Although this information would not have been known to the officers, the fact of her prior abuse by police officers was known.

immediately and why she headed to her house. An officer certainly is entitled to take what he knows about a suspect's history into account in deciding on a reasonable amount of force. See *DeLuna v. City of Rockford*, 447 F.3d 1008, 1010, 1012 (7th Cir. 2006) (use of deadly force was reasonable based in part on officer's knowledge of suspect's history of violence and that he was "known to both carry and sell weapons"). And, under the same reasoning, it would be unreasonable for an officer to refuse to take his knowledge of the suspect into account. Moreover, it would create an odd asymmetry to say that a police officer may consider a suspect's prior bad acts when considering the amount of force to use, but need not consider his own prior bad acts. In this case, Officer Richardt testified that it was within his realm of knowledge that a reasonable person in Burton's shoes might have reason to fear the police. Officer Richardt testified at his deposition:

> Q.  I'm not asking you how she felt. Would it be reasonable to understand—Given that your job, your training, is to take into consideration the thoughts and mental processes of others as part of your totality of circumstances test—just taking that into consideration—would it be reasonable and part of your job to take that into consideration attributable to your job?
>
> A.  Yes.
>
> Q. So would it be reasonable to take into consideration, from your point of view, that Ms. Burton may be afraid of you at the time you arrested her?
>
> A.  I don't know if she was afraid of me or not.

Q.  I'm not asking if she is afraid of you. Would it be reasonable for you to take that into consideration that at the time you arrested her in March 2014—

A.  Yes.

Q.  —that she was afraid of you? Okay. And it would be reasonable for her—Strike that. It would be reasonable to take that into consideration given that there was a finding by your Department that you had used too much force with her back in 2008, correct?

A.  Right.

Q.  And she filed a lawsuit against you, right?

A.  Right.

Q.  And do you know that the City paid a significant sum of money attributable to that lawsuit?

A.  Yes.

Q.  Okay. So in her mind as a civilian, you could appreciate that she may have some significant concerns attributable to you, correct?

A.  Right.

Q.  I'm not saying she is right or wrong about those concerns. I'm saying: As a civilian—not a cop, not a judge, not an attorney—she may have her own personal concerns, right?

A.  Yes.

Q. That is something you should take into con-
sideration when you're arresting her, right?

A. Yes.

R. 68-6 at 26–28. Officer Richardt did not need to know how
Burton felt at the time, he only needed to know that she had
been handcuffed and tasered by a police officer before, that
such an experience would have been painful and unpleasant,
that the City of Zion had determined that the action was un-
warranted, and that a reasonable person would not want to
have it happen again. He knew all of these things. We need
not focus on whether Officer Richardt took this knowledge
into consideration (although he testified that it was something
"he should take into consideration" R. 68-6 at 28), we need
only focus on whether it is the kind of information that a rea-
sonable officer should take into consideration. Officer Rich-
ardt's testimony is merely additional evidence of what a rea-
sonable police officer would do.

Moreover, we know that the question "why did Burton re-
fuse to stop" was a key question facing the jury because the
defendants made it so. They mentioned her mysterious re-
fusal to stop no less than eight times in closing argument as
follows:

- Now you have seen and heard multiple
times now plaintiff did not stop properly. R. 141
at 30.

- Instead of stopping she went to her home. *Id.*

- You heard that Officer Meyers activated his
lights, his sirens, and attempted to pull her over,
[B]ut she didn't stop. *Id.*

- It is undisputed that they tried to pull her over, that she knew they were trying to pull her over. *Id.* at 34.

- They attempted to get her to stop. Sergeant Arrington pulled in front of her. She didn't stop. She went home. *Id.* at 38.

- After a sequence of events wherein they tried—tried to use the lower—presence commands. She didn't comply. *Id.*

- It was escalating because she failed to comply. And there was a chase. *Id.* at 40.

- Again, we have to consider what they knew. They didn't know whether she had a gun. They didn't know whether she had drugs. All they knew is that she wasn't going to stop. *Id.* at 42.

The last comment was particularly ironic because, in fact, Burton was the one who wanted the jury to consider everything the officers knew. But it was the defendants who fought the admission of a key piece of their knowledge. It was not in fact true that "[A]ll they knew is that she wasn't going to stop." They also knew that she had been on the receiving end of excessive force by police in the past.

In other words, although they could not have known for certain what was in her mind, they did know the following: (1) she had been stopped before, handcuffed, and stunned with a taser; (2) this behavior was found to be an excessive use of force; (3) being subjected to a taser is painful, distressing and, quite literally, stunning; (4) a reasonable person

would not want to be on the receiving end of a taser again. Any reasonable officer, with all of this knowledge would have to at least consider the possibility that Burton was avoiding a similar encounter to the previous one. One would not need to be a mind reader to put the facts together, just a person of reasonable intelligence. To put it another way, no reasonable officer with this information could not have considered the fact that Burton might be trying to get to a safe public place to have an encounter with the police.

To see why this is clear, we present a few hypothetical scenarios. Suppose Officer Richardt encountered a deaf suspect—we will call her Sophia—and, after calling to her to stop several times, she does not stop (because, of course, she cannot hear him) and he fires his taser to stop her, only to find out, after the fact, that she is deaf. In all likelihood a finder of fact might give his use of this force a pass because, at the time of the events, Officer Richardt could not have known that the suspect was deaf. Now, however, suppose he encounters Sophia six years later, radios to his commander that he is following "Sophia," and once again he calls to her from behind and she does not stop. This time if he uses a taser to stop her, or tackles her, or uses a "straight arm takedown," a jury could certainly find that this use of force was excessive in light of the facts known to the officer at the time—that Sophia could not respond to his order because she could not hear it. It would be error for a trial judge to exclude the evidence that Officer Richardt knew the suspect was deaf. That evidence, after all, is not being used to demonstrate propensity—that Officer Richardt was the type of person who was too quick to use a taser or other excessive force—but rather it was being used only to demonstrate that he knew about some

characteristic of the suspect that he should have considered before using the level of force that he did. This case is no different.

Moreover, imagine the same scenario above, except this time, a different officer fired his taser at the deaf suspect, Sophia, during the first episode, but it is undisputed that Officer Richardt knew about the incident and knew that Sophia was deaf. It would still be relevant evidence—offered not to demonstrate anyone's propensity for excessive force, and certainly not Officer Richardt's, but rather, to show that Officer Richardt knew Sophia was deaf and yet used force to subdue her when she refused to heed his oral command.

Rule 404(b) allows for prior bad act evidence if "the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way." *Gomez*, 763 F.3d at 860. In this case the evidence was relevant to show Officer Richardt's knowledge that Burton had a frightening and painful encounter with a Zion police officer before—one that had not been justified. It can be completely divorced from a chain of reasoning that involves propensity because, in this case, the evidence was not used to argue that Officer Richardt "ha[d] a certain character and acted in accordance with that character on the occasion charged in the case." (*Gomez*, 763 F.3d at 860)—in other words that he was the type of officer who used excessive force. It was used to demonstrate his knowledge of Burton's prior experience of having been subject to a taser. We know the evidence is relevant without relying on a propensity inference because it would have been just as useful to Burton if the prior incident had involved a different officer, but it was undisputed that Officer Richardt knew about it. And it would have been just as helpful to Burton in

this case to demonstrate Officer Richardt's knowledge if, other than the incident of the tasing of Burton, Richardt had a perfect police record, had never used a taser or "straight arm take down" before, he had never been accused of excessive force by anyone else, and had a personnel file full of letters from citizens praising him for fair, civil, respectful interaction. Burton did not need to demonstrate that Richardt was the type of person who always acted this way at all; in fact, Burton only needed to demonstrate that she previously had a very frightening interaction with him of which he was aware. After that, it was up to the jury to decide whether Richardt's behavior was reasonable given what he knew. It was error, however, for the district court to have applied the four factor test used in *Vargas* without sufficient flexibility for the context of this case, and it was error for the court to have labeled the evidence as inadmissible propensity evidence. It was not.

*Gomez* requires reflective discretion—that is, "identifying the non-propensity theory that makes the other-act evidence relevant and specifically asking *how* the evidence tends to make a particular fact of consequence more or less probable." *Gomez*, 763 F.3d at 856. Other-act evidence need not be excluded whenever a propensity inference can be drawn, provided its relevance to another purpose can be established through a chain of reasoning that does not rely on the forbidden inference. *Id.* at 860. This requires more flexibility in analysis than the *Vargas* factors allow.

Finally, we address the application of Federal Rule of Evidence 403 which allows a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. *Gomez* requires that after a proponent of potential evidence establishes relevance

in a manner that does not rely on the forbidden propensity inference, the court must "in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great." *Gomez*, 763 F.3d at 860. The district court mentioned Federal Rule of Evidence 403 only in passing, while evaluating the similarity and closeness in time between the two incidents as required by the now-abandoned *Vargas* test. In the process of considering recency and similarity, the district court stated, in one sentence, without further explanation, that "any probative value the 2008 evidence may have is substantially outweighed by the danger of unfair prejudice." R. 116 at 13. The district court's weighing of probative value and prejudice in the context of its evaluation of similarity and recency was based on its conclusion that similarity and recency were relevant to the inquiry in this case. We have held that they are not.

The district court did not have reason to consider Rule 403's weighing requirements while considering the other *Vargas* factors or the nature of the previous stop overall, because it found that the evidence should be excluded under Rule 404. On appeal it is up to this court to determine whether the evidence is so prejudicial when compared with the probative value that no reasonable district court judge could have allowed it to come in. This is certainly not the case here.

Having decided that the evidence was not barred by Rule 404, the district court, on remand, can balance the probative value of the 2008 stop against the potential prejudice, keeping in mind the following considerations: In this case there was indeed a risk that the jury might conclude that Officer Richardt had a propensity to use excessive force. Any prejudice

the defendant may have faced from the admission of other-act evidence, however, could have been mitigated by appropriate jury instructions. *Gomez*, 763 F.3d at 860. In fact, in *Gomez*, this court even offered specific instructions on how to phrase a jury instruction limiting propensity evidence by explaining to the jury that "they must not use the other-act evidence to infer that the defendant has a certain character and acted 'in character' in the present case because it does not follow from the defendant's past acts that he committed the particular crime charged in the case." *Id.* at 861. See also *id.* at 865 (Hamilton, J., concurring in part and dissenting in part) (suggesting a specific jury instruction which instructs as follows: "The government cannot meet its burden by inviting you to infer that the defendant is a person whose past acts suggest he has a bad character or a tendency to commit crimes."). We presume that juries follow the court's instructions. *Kansas v. Carr*, 136 S. Ct. 633, 636 (2016); See also *Gomez*, 763 F.3d 860–61. Of course, another way the district court can mitigate the prejudice to the defendants is to use its discretion to determine how the facts of the 2008 stop are presented to the jury.

The district court will also have to consider how highly probative the evidence of the prior stop would be. Burton's failure to stop must have raised myriad questions for the jury. Most law-abiding citizens stop for the police, and we can assume that most, if not all, members of the jury have never refused to stop for the police. There are usually two primary reasons that a person would refuse to stop for the police. First, and more commonly, if she is guilty of a crime and trying to escape or get rid of evidence, or second, if she is in fear, either of the police or of the potential that the pursuer is an imposter. The 2008 evidence was probative of this critical question that was likely on every juror's mind.

## II.

The fact that Burton had been subjected to excessive force by the police on a prior occasion was not propensity evidence and could not be excluded under Federal Rule of Evidence 404. On remand, the district court will have to weigh the probative value against the potential prejudice keeping in mind the ways in which any prejudice can be mitigated. We REVERSE the district court's ruling on the motion in limine and REMAND for further proceedings consistent with this decision.