In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-2851

LYRAH HERNANDEZ, as Special
Administrator for the Estate of
Luis Cruz,

*Plaintiff-Appellant,*

*v.*

CITY OF PEORIA, ILLINOIS, and
RYAN ISONHART,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:19-cv-01153-JES-JEH — **James E. Shadid**, *Judge.*

_____

ARGUED OCTOBER 21, 2024 — DECIDED APRIL 21, 2025

_____

Before ROVNER, SCUDDER, and LEE, *Circuit Judges.*

ROVNER, *Circuit Judge.* In the early hours of July 19, 2018, Peoria Police Department Officer Ryan Isonhart fatally shot Luis Cruz. At the time of his death, Cruz was fleeing from officers and—according to Isonhart and his partner Nicholas Mason—pointing his gun at Mason. Following Cruz's death,

Lyrah Hernandez, Cruz's sister, brought suit on behalf of Cruz's estate alleging federal claims under 42 U.S.C. § 1983 and state law claims against Officer Isonhart, Officer Mason, and the City of Peoria. The district court granted defendants' request for summary judgment as to the claim against Officer Mason, and the matter went to trial against the remaining defendants. Ultimately, the jury found in favor of the defendants. Hernandez now appeals, alleging that the district court abused its discretion by admitting four specific pieces of evidence and barring testimony from two individuals. We affirm the decisions of the district court.

## I.

At the time of his death, Cruz was the father of twin girls. Cruz was incarcerated when the twins were born, although the girls did visit Cruz while he was in prison. Within one month of Cruz's release, the Illinois Department of Child and Family Services removed the girls from the home. To obtain visitation rights, the Department of Child and Family Services required that Cruz complete a parenting class. Cruz chose not to complete the class, and the girls were returned to their mother after Cruz's death with no finding of wrongdoing, abuse, or neglect. At the time of his death, Cruz also had a pending charge for unlawful possession of a controlled substance.

Immediately prior to his death, Cruz was in a car driven by Shaquille Alexander. Cruz was the subject of two "49 messages"—intra-department alerts that notify officers that probable cause exists to arrest an individual and the basis for that probable cause. According to the 49 messages, Cruz was wanted in connection with a shooting and a domestic battery incident.

After receiving information that Cruz and Alexander were together in a red Pacifica, Isonhart and Mason located the Pacifica parked outside of an apartment complex. While they were waiting outside of the apartment building, Mason and Isonhart viewed a live Facebook video showing Alexander and Cruz together in an apartment. Later, Cruz and Alexander exited the apartment together and began driving in the Pacifica again. Isonhart and Mason followed the Pacifica in their semi-marked squad car. After following the Pacifica for a short time, Mason activated the vehicle's lights and, when the Pacifica did not pull over, the siren.

Isonhart and Mason's squad car had a dashcam, and the jury viewed the dashcam footage during trial. The following is a description of the dashcam video. As the Pacifica slowed to stop, Cruz jumped out of the passenger seat clutching at his pants. Cruz ran in front of the Pacifica, and Isonhart gave chase. Although not seen on the dashcam, Mason also exited the vehicle, and the sound of the vehicle door closing can be heard on the video. Isonhart called out to Cruz,[1] which can be heard on the video, and Cruz began to turn toward Isonhart while continuing to run toward the edge of the dashcam's visual frame. Isonhart can still be seen in the center of the frame. Cruz then runs out of frame, and Isonhart begins shooting his weapon, still in frame. According to the defendants, while Cruz was out of frame, he pointed his gun at Mason and

---

[1] The parties dispute what Isonhart said to Cruz, and the statement is not well captured on the video. Because the content of Isonhart's statement to Cruz is not material to the resolution of the questions before us, we decline to resolve this factual dispute.

racked[2] it, thus causing Isonhart to fear for the life of his partner and fire his weapon at Cruz.

After the shooting, Cruz's gun was found near his body, as was a bullet that was the same caliber as the bullets in Cruz's gun. The investigator on scene—Timothy LeMasters—did not swab the slide of the gun for fingerprints despite being told that Cruz racked the gun. A few hours after the shooting, Alexander gave a video and audio recorded statement to Illinois State Police officers investigating the shooting where he explained that he did not see Cruz pull out a weapon before Isonhart shot him.

On July 24, 2018, the Illinois State Police held a Major Case Review meeting about the shooting. One purpose of the meeting was to review the testing already done, and to determine what additional testing needed to be conducted. One attendee was Jennifer MacRitchie, an Illinois State Police forensic scientist, who, after the meeting, authored a "conversation report"—notes recording the information she learned during the Major Case Review meeting, *see* R. 99 at 14:13–14—in which she did not mention that Cruz racked the gun. After the meeting MacRitchie did not order additional testing of the gun's slide. Even though other attendees' identities are unknown, the parties agree that Isonhart did not attend the meeting.

Before trial, the plaintiff made multiple motions *in limine*. As relevant here, the plaintiff sought to bar admission of the 49 messages, the Department of Child and Family Services investigation, the fact that Cruz was incarcerated at the time his

---

[2] Racking a gun involves pulling the gun's slide so that a round is chambered, and the previously chambered round is ejected.

daughters were born, and Cruz's pending drug charge at the time of his death.

The district court found the 49 messages relevant to Isonhart's state of mind at the time of the shooting. The district court also found that the messages would be relevant if the plaintiff argued at trial that Isonhart did not need to give chase. In the same ruling, the district court barred defendants from telling the jury that Cruz was a person of interest in a murder investigation at the time of his death. In outlining its reasoning, the district court explained that telling the jury that Cruz was a person of interest in a murder "leads to too many questions, too many thoughts, and that could be—the prejudice could outweigh the probative value. So, domestic violence or domestic battery and a shooting for now." R. 96 at 12:2–9. The plaintiff orally sought reconsideration, arguing that the defendants could explain to the jury that Cruz was wanted for two separate crimes without specifying the crimes. The district court denied the motion for reconsideration, reiterating that the crimes for which Cruz was wanted went to Isonhart's state of mind.

The district court also found the Department of Child and Family Services investigation relevant to Cruz's damages, and it denied both the plaintiff's motion *in limine* and the plaintiff's motion for reconsideration. The district court explained that the daughters' removal from the home and Cruz's failure to follow the steps necessary to obtain visitation rights were relevant to the plaintiff's damages. Similarly, the district court found Cruz's incarceration at the time of his daughters' birth relevant to the plaintiff's damages stemming from the claimed loss of society.

Initially, the district court opined that Cruz's pending drug charge would be relevant to respond to the plaintiff's claims that Cruz fled from police because he distrusted them, but the district court reserved ruling on the issue until closer to trial. On the fourth day of trial, the plaintiff sought clarification about the court's ruling and the court stated that "[t]he defense could introduce evidence that Mr. Cruz was facing pending possession of controlled substance charges at the time of the incident as it pertains to damages and loss of society." R. 133 at 797.

Notably, in discussing the plaintiff's arguments that these pieces of evidence were too prejudicial, the district court offered twice to bifurcate the trial, which the plaintiff refused. R. 96 at 14:4–15:12, 25:9–21. At the final pretrial conference, after the plaintiff presented her motions for reconsideration, the district court again offered to bifurcate the trial stating "based on some of the rulings I made, there would be so much about Mr. Cruz that would not be admissible if it was just liability first and then damages second." R. 99 at 33:13–34:1. The plaintiff did not consent to bifurcation.

Before trial, the defendants made their own pretrial motions. Specifically, the defendants sought to bar MacRitchie from testifying because the plaintiff had not timely disclosed her as an expert witness. Even though the plaintiff claimed that MacRitchie was a fact witness, *see* R. 98-3 at 6, defendants argued that MacRitchie's testimony regarding DNA testing would be expert in nature. R. 98. The plaintiff explained to the district court that the focus of MacRitchie's testimony would be about "the information that she received from the Peoria Police Department and how that dictated the actual testing that she performed and why she made the decisions that she

made." R. 99 at 15:11–15. This information was relevant, the plaintiff explained, because MacRitchie's incident report was "opposite" to the officers' testimony, and the plaintiff suspected that the rack "likely would have been tested for touch DNA" if MacRitchie "had been told that [Cruz] racked the gun." *Id.* at 15:22–16:19. However, plaintiff noted that she "had no idea who was at this Major Case Incident Review." *Id.* at 17:12–13. The district court opted to reserve its ruling until trial. *Id.* at 18:7–17.

Approximately one week prior to trial, the district court entered a ruling barring MacRitchie from testifying. Specifically, the district court found MacRitchie's proffered testimony to be expert in nature. The district court explained as follows:

> Plaintiff proffered that MacRitchie would be called to identify her role in the investigation and to be questioned about documentation that she drafted. [Plaintiff seeks] to question MacRitchie about what she and others in the Illinois State Police investigation were told about how the events at issue in this case occurred, and how they structured their investigation as a result. In particular, Plaintiff contends that the version of events that MacRitchie was given, which were documented in a Major Case Review, do not include the alleged fact that the decedent "racked the slide" on his gun as he pointed it at PPD Officer Mason. Additionally, MacRitchie allegedly did not swab this portion of the firearm that was recovered for the decedent's DNA, which Plaintiff will presumably

> argue she would have done had she been told that Cruz racked the slide. These aspects, particularly the second, fall within the realm of expert testimony: what level of information a forensic scientist is typically given, what steps they take in an investigation and how they shape their testing based on the information they are given cannot be properly understood without an explanation of the scientific and technical background underpinning each point. Without expert testimony, the jury would not be able to adequately decide which of the possible explanations of this testimony is more credible—Plaintiff's allegation that MacRitchie didn't test the slide because she wasn't told about that detail as it was fabricated at some later point, or any of the innocent explanations that Defendants could offer. As Plaintiffs failed to disclose MacRitchie as an expert, the Rules mandate that they cannot call her as such.

R. 100. The plaintiff sought reconsideration, which the district court denied. In doing so, the district court explained that the conversation record was a "vague summary" and that it was unclear whether "it would have even included the racking the slide allegation" thus diminishing MacRitchie's ability to impeach Isonhart's testimony. *See* R. 129 at 21:3–6. Further, the district court explained, even if MacRitchie was aware that Cruz allegedly racked the gun's slide, "talking about doing further testing and then having to explain what that means is expert testimony […] or close to it." *Id.* at 21:4–10.

Before trial, the plaintiff also sought to admit Alexander's statement under the residual hearsay exception, Rule 807 of the Federal Rules of Evidence. At the same time that the district court judge ruled on the defendants' summary judgment motion, the district court also barred admission of Alexander's video and audio interview with police. In doing so, the district court evaluated the statement's trustworthiness and found it lacking. Notably, the district court explained that Alexander admitted that "he did not see the critical seconds before Cruz was shot" and that Alexander's statement "makes assumptions, rather than observations from personal knowledge, regarding the incident." R. 60 at 7.

The trial spanned six days. After slightly more than three hours of deliberation, the jury ultimately returned a verdict in favor of the defendants. Because the jury found in the defendants' favor on liability, it did not consider damages. The plaintiff now appeals, challenging the district court's evidentiary rulings. Specifically, the plaintiff challenges the district court's decisions to admit the 49 messages, the Department of Child and Family Services investigation, the fact that Cruz was incarcerated at the time his daughters were born, and Cruz's pending drug charge at the time of his death, as well as the district court's decisions barring MacRitchie from testifying and Alexander's recorded statement.

## II.

We begin with the plaintiff's challenges to the evidence the district court admitted before turning to the challenges to the evidence that the district court barred. This former category includes the crimes underlying the 49 messages, the Department of Child and Family Services investigation, the fact

of Cruz's incarceration at the time of his daughters' birth, and Cruz's pending drug charge at the time of his death.

We review each of the district court's evidentiary rulings for abuse of discretion. "A determination made by a trial judge regarding the admissibility of evidence is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017) (internal quotation marks omitted) (quoting *United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000)). "We will reverse only if no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). Even though this bar is quite high, the plaintiff does not need to show that, on remand, a jury will come out the other way. *United States v. Richards*, 719 F.3d 746, 765–66 (7th Cir. 2013).

First, the plaintiff challenges the district court's decision to admit the crimes underlying the 49 messages. Specifically, that officers had probable cause to arrest Cruz for a shooting and domestic battery. The plaintiff argues that the district court impermissibly allowed the 49 messages to be admitted for propensity purposes.

The crimes for which Isonhart and Mason pulled Cruz over are directly relevant to the objective reasonableness of Isonhart's force. Indeed, the reasonableness inquiry turns on the "facts and circumstances of each particular case" including "the severity of the crime at issue." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Isonhart knew that Cruz was wanted for a domestic battery and in connection with a shooting. Indeed,

that is part of the reason why officers sought Cruz that evening. Tr. 162:2–5; 225:12–21. "[T]he knowledge of the officer is a critical inquiry in any assessment of reasonable force." *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018). To omit the crimes for which Cruz was wanted would have kept valuable information from the jury that was directly relevant to their determination, and the district court did not abuse its discretion in allowing the limited amount of information that it did about the 49 messages.

Against this well-established legal backdrop, the Plaintiff argues that the 49 messages constitute improper other-act evidence. But the district court did not admit the 49 messages as other-act evidence. It admitted the evidence to explain "why Isonhart wanted to make the stop," "to establish what Isonhart's state of mind was," and to counter an argument that the officers did not need to chase Cruz. R. 96 at 8–10. "Other-act evidence need not be excluded whenever a propensity inference can be drawn, provided its relevance to another purpose can be established through a chain of reasoning that does not rely on the forbidden inference." *Burton*, 901 F.3d at 784.

The plaintiff argues that the district court did not properly consider the prejudicial nature of the evidence, and she claims that the prejudice outweighs the highly probative value of the evidence. "[A]ll evidence is prejudicial." *Common v. City of Chicago*, 661 F.3d 940, 947 (7th Cir. 2011). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011). As discussed above, the evidence was highly probative, and it is unclear how the brief mention of the underlying crimes for

which Cruz was wanted without details about the crimes themselves would create prejudice sufficient to outweigh this probative value. *See Common*, 661 F.3d at 947. And notably, the district court overruled the plaintiff's motion *in limine* in the same breath that it barred other evidence for being more prejudicial than probative. R. 96 at 12:2–9. Under these circumstances, including the highly probative nature of the evidence, we cannot conclude that "no reasonable person would agree with the trial court's ruling." *Perry*, 733 F.3d at 252.

The district court did not abuse its discretion in admitting evidence that Cruz was incarcerated at the time of his daughters' births, nor did it abuse its discretion when it admitted evidence of the Department of Child and Family Services investigation. Both pieces of evidence were directly relevant to the plaintiff's damages. The jury was instructed that, if it found in Hernandez's favor, it "must then fix the amount of money which will reasonably and fairly compensate Luis Cruz's daughters […] for the pecuniary loss proved by the evidence to have resulted to Luis Cruz's children from his death." R. 115 at 24. The instructions included the "loss of money, benefits, goods, services, and society" in pecuniary loss, and defined loss of society as "the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection." *Id.*; *see also id.* at 27. The instructions directed the jury that it "may consider what the evidence shows concerning […] [t]he relationship between Luis Cruz and his children[.]" *Id.*

As we explained in *Cobige*, when a plaintiff introduces evidence that paints the decedent's character in a positive light, the defendants are permitted to introduce evidence that

paints a contradictory picture. *Cobige v. City of Chicago*, 651 F.3d 780, 784 (7th Cir. 2011), *as amended on denial of reh'g* (Sept. 8, 2011). This is not to say that prior criminal acts are always relevant in wrongful death or Section 1983 cases. Instead, we must consider the scope of the harm the plaintiff is claiming that he or she suffered, and the relevance of the proffered evidence in directly rebutting that harm. *See Barber v. City of Chicago*, 725 F.3d 702, 713–14 (7th Cir. 2013); *Smith v. Hunt*, 707 F.3d 803, 809 (7th Cir. 2013). For example, the plaintiff in *Cobige* testified that Cobige, the decedent, "had been a friend as well as a parent, a bulwark of support and a role model throughout his life." *Cobige*, 651 F.3d at 784. In response, the defendant "was entitled to introduce evidence suggesting that Patricia Cobige was not likely to assist others" and to allow "defense counsel to ask just what kind of 'role model' she could have been." *Id.* at 784–85.

Here, the plaintiff presented evidence to the jury that Cruz was a present and involved father. For example, the twins' mother testified that Cruz was "very close to the girls" and was a patient, caring, overprotective father who "always wanted [the twins] to be in a good environment." R. 133 at 882:17–883:1. She testified that Cruz "did a lot of things with the girls" and testified about the activities he can no longer do with them, and guidance he cannot give them now. *Id.* at 885:13–20, 897:20–898:23. Hernandez testified that Cruz was an attentive and caring father who was learning about parenthood, and that he was committed to bettering his life at the time of his death. *Id.* at 915:23–916:2, 918:21–25, 927:10–16. Cruz's prolonged absence from his daughters' lives and subsequent refusal to take parenting classes so that he could visit them is directly relevant to the jury's understanding of Cruz's involvement with his daughters and the closeness of their

relationship. The plaintiff presented evidence that Cruz was an attentive and caring father who wished to spend time with his children. Defendant was, in turn, permitted to present evidence that Cruz was absent for much of the twins' lives and did not take the steps necessary to see his children. Even if reasonable jurists could disagree about admitting the reasons for Cruz's absence—that is, his incarceration and the Department of Child and Family Services investigation—that disagreement is insufficient to demonstrate that the district court abused its discretion. *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 875 (7th Cir. 2011) ("[T]he district court's decision is to be overturned only if no reasonable person would agree with the trial court's ruling.").

Finally, we consider the district court's decision that Cruz's pending drug charge was relevant to the plaintiff's damages. The difficulty with a pending drug charge, of course, is that it is an unproven allegation. As an unproven allegation, it is unclear what, if anything, could be inferred from the charge that would affect Cruz's "love, affection, care, attention, companionship, comfort, guidance, and protection." R. 115 at 27. Indeed, it is possible that Cruz would be found not guilty of the possession charge, and that he would return to being the father that the plaintiff and the twins' mother testified that he was. Defendants cite *Cobige* in support, but the decedent in *Cobige* "was in prison for extended periods, and in thrall to heroin when not imprisoned." *Cobige*, 651 F.3d at 784. Within this context, the district court erroneously barred admission that, at the time of her death, the decedent was "in the lockup following arrest on yet another drug charge." *Cobige*, 651 F.3d at 784. Thus, the unproven allegation in *Cobige* was directly related to the circumstances of the decedent's death and an ongoing heroin addiction that

could reasonably be expected to affect the relationship between the decedent and the plaintiff. Here, it is not clear that Cruz's pending drug charge provided the same insight into his relationship with his daughters.

But even if we assume that the district court erred, the error was harmless. Reversal is only required where the evidentiary error had "a substantial and injurious effect or influence on the jury's verdict" such that "a significant chance exists" that the error "affected the outcome of the trial." *Narkiewicz-Laine v. Doyle*, 930 F.3d 897, 901 (7th Cir. 2019) (cleaned up). No such chance exists here.

The evidence supporting the jury's liability verdict was overwhelming. Cruz's gun was found near his body and a bullet from that gun—which would have been ejected if Cruz racked the gun—was also nearby. The plaintiff challenges neither that evidence, nor more generally the sufficiency of the evidence supporting the jury's verdict, and the unchallenged evidence provides a strong basis for the jury's verdict. *Lange v. City of Oconto*, 28 F.4th 825, 845 (7th Cir. 2022).

Aside from the strength of defendants' case, the jury already knew that officers wished to arrest Cruz for two violent crimes at the time of his death, so the information did not newly suggest that Cruz had brushes with the law, nor did it newly suggest that, at the time of his death, Cruz was embroiled in illegal activity. "As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless." *Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013) (collecting cases). In light of the other evidence admitted at trial, it is improbable that the inclusion of Cruz's pending drug charge had "a substantial and injurious effect or influence on the jury's verdict" such that "a significant

chance exists" that the error "affected the outcome of the trial." *Narkiewicz-Laine*, 930 F.3d at 901.

## III.

We now turn to the evidence that the plaintiff wished to admit but that the district court barred. This category of evidence includes Alexander's recorded statement and MacRitchie's testimony. As with the evidence the plaintiff alleges the district court improperly included, we review the district court's decision to exclude evidence for an abuse of discretion. *Lange*, 28 F.4th at 842. "We will reverse only if no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial." *Perry*, 733 F.3d at 252.

The district court did not err in barring Alexander's recorded statement. The plaintiff moved to admit Alexander's statement under the residual exception to the rule against hearsay. *See* Fed. R. Evid. 807. "We construe the Rule 807 requirements narrowly." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 233 (7th Cir. 2021) (citing *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019)). The plaintiff argues that the district court's evaluation of Alexander's statement was too "mechanical" in that it did not adequately consider that Alexander was the only non-police eyewitness to the shooting and that the COVID-19 pandemic interfered with Alexander's deposition. To the extent that COVID made Alexander unavailable, that was not adequately explained to the district court. *See* R. 60 at 8–9 (district court noting that the plaintiff provided "no reason for Alexander's unavailability" and no "evidence of her efforts to attempt to contact Alexander" after she "served Alexander for a deposition prior to the COVID lockdowns of 2020"). And while the plaintiff argues that

Alexander was the only non-police witness to the shooting, the district court found that Alexander "did not see the critical seconds before Cruz was shot" and that Alexander made "assumptions, rather than observations from personal knowledge, regarding the incident." R. 60 at 7.

Perhaps more fundamentally, as the district court's thoughtful and thorough written opinion explained, it barred Alexander's statement because the statement lacked the "circumstantial guarantees of trustworthiness equivalent to those contemplated under Rule 807." R. 60 at 9. The plaintiff does not argue that the district court's analysis itself was wrong, or that Alexander's statement was "supported by sufficient guarantees of trustworthiness." Fed. R. Evid. 807. Instead, she argues that the district court did not give enough weight to factors that she deems important. This is not an abuse of discretion particularly where, as here, the district court considered the factors that the plaintiff claims it did not. And to the extent that the plaintiff argues that the district court should have abdicated its responsibility to determine the admissibility of the evidence, and that it should have instead allowed the jury to determine the statement's credibility, that argument misapprehends the law and the district court's duty. Finding the statement trustworthy is a prerequisite to admission. *See* Fed. R. Evid. 807(a)(1).

The plaintiff further argues that Alexander's statement should have been admitted as an excited utterance. But as the plaintiff seems to realize in her reply brief, she did not raise this argument to the district court, and thus she asks us to review for plain error. "Our ability to review for plain error in civil cases is severely constricted," because "a civil litigant 'should be bound by his counsel's actions.'" *SEC v. Yang*, 795

F.3d 674, 679 (7th Cir. 2015) (quoting *Deppe v. Tripp*, 863 F.2d 1356, 1360 (7th Cir. 1988)). This case does not present an exceptional circumstance that would warrant review for the first time on appeal. *See id.* As the district court noted, Alexander stated that he did not see the critical moment of the shooting, thus limiting the value of the evidence in answering the critical questions that faced the jury.

Similarly, the plaintiff argues that MacRitchie's testimony should have been admitted, and that her testimony was not expert in nature. Recall that plaintiff wanted to admit MacRitchie's testimony to impeach Isonhart's testimony that Cruz racked his gun. Even setting aside the nature of MacRitchie's testimony, it is unclear how the testimony itself was relevant for impeachment purposes. Before both the district court and this court, the plaintiff was unable to articulate a link between MacRitchie's conversation record and the defendants, severely hindering any impeachment value of the evidence. Tr. 16:9–18:15, 21:11-16. The plaintiff invites us to speculate that the information must have come directly from someone with sufficient knowledge of the events to impeach Isonhart's testimony, despite recognizing that she has no knowledge or record of who attended the meeting aside from MacRitchie, nor any knowledge of how the meeting's attendees learned the relevant facts. Hernandez Reply Br. at 16; R. 99 17:12–13. We decline the plaintiff's invitation to speculate.

## IV.

For the above reasons, the judgment of the district court is AFFIRMED.